**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

EARL ANTHONY NEVILS, a/k/a EARL
NEVILS, JR., EARL BOWMAN, EARL
JOHNSON, ALFRED JOHNSON,
"BABYCRIPTOE," "LILAMIGO" and
"BABY FROG,"
        *Defendant-Appellant.*

No. 06-50485

D.C. No.
CR-03-01269-CBM

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted
September 22, 2009—San Francisco, California

Filed March 19, 2010

Before: Alex Kozinski, Chief Judge, Pamela Ann Rymer,
Sidney R. Thomas, Barry G. Silverman, Raymond C. Fisher,
Ronald M. Gould, Richard C. Tallman,
Johnnie B. Rawlinson, Richard R. Clifton,
Milan D. Smith, Jr. and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta

## COUNSEL

Elizabeth A. Newman, Deputy Federal Public Defender, for the appellant.

Sandy N. Leal, Assistant United States Attorney, and Daniel B. Levin, Assistant United States Attorney, for the appellee.

## OPINION

IKUTA, Circuit Judge:

Earl Anthony Nevils appeals from his conviction for being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1).[1] Nevils argues that the evidence presented at trial is constitutionally insufficient to support his conviction because it is susceptible to an innocent explanation. Contrary to Nevils's argument that we should construe the evidence in the light most favorable to innocence, we are obliged to construe the evidence "in the light most favorable to the prosecution," and only then determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Here, viewing the evidence as required by *Jackson*, we hold there was sufficient evidence to permit a rational juror to conclude beyond a reasonable doubt that Nevils knowingly possessed firearms and ammunition. We therefore affirm.

## I

Late in the evening of April 14, 2003, three officers of the Los Angeles Police Department's Special Enforcement Unit were on patrol in a high-crime area of south Los Angeles. Driving past an apartment building known for criminal activity associated with the "Rollin' 30s" gang, the officers encountered three men and two women standing on the sidewalk. Officer Jason De La Cova asked the group about its

---

[1] 18 U.S.C. § 922(g) provides, in relevant part:

> It shall be unlawful for any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

activities that evening. One of the men answered that they were doing "[n]othing." Upon being asked whether any of the group lived in the apartment building, the same man responded "It's okay. We're out of here right now." He abruptly turned and ran "at a high rate of speed" down the center path of the apartment complex. Officer De La Cova and his partner Officer Jason Clauss followed the man up the apartment walkway and observed him turn left in the walkway to grasp the door-handle of Apartment 6. Upon seeing the officers in his wake, the man quickly let go of the door, crossed the walkway to Apartment 2, and entered. He then closed and locked the door.

After trying and failing to convince the man to open the door to Apartment 2, the officers turned their attention to Apartment 6. First, they asked two women standing in the walkway who lived there; the women indicated that no one did. Approaching the door to Apartment 6, Officer De La Cova noted that the black security gate was ajar by several inches, and that the main wooden door was open and leaning off its hinges against the living-room wall. Looking through the security door, Officer De La Cova was able to see into the well-lit apartment. There, lying upon the couch, was Nevils, apparently asleep, with his right leg dangling off of the couch. A "machine gun" sitting on Nevils's lap was clearly in view from De La Cova's position at the front door. A handgun leaning against Nevils's right leg was also visible.

Officer De La Cova gave a hand-sign to his partner and the two jointly entered the apartment, weapons drawn. No one else was there. As the officers approached Nevils, he woke up, and as Officer Clauss testified, "his eyes . . . fully opened and for a brief second he appeared like he was going to, you know, grab towards his lap and then he stopped and put his hands up." On command of the officers, Nevils got on the ground, leaving the firearms lying on the couch. Officer De La Cova retrieved the firearms, discovering that both were loaded. A coffee table, laden with marijuana packaged for

sale, ecstasy, over $500 in cash, and a cell-phone, was situated one foot away from the couch where Nevils had been sleeping.

Other officers arrived on the scene shortly thereafter, including Sergeant Jean Coleman, who asked Nevils whether he was injured or sick. Nevils indicated he was not, and instead cursed absent cohorts, saying that he couldn't believe that "[they] left me sleeping and didn't wake me." The loaded firearms found in Nevils's possession later were identified as a Tec-9 semi-automatic weapon, loaded and chambered with 14 live rounds of ammunition, and a .40-caliber handgun, also loaded and chambered with 13 live rounds of ammunition.

Initially booked on charges of possession of marijuana for sale, Nevils was charged on a single count of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1). At trial, the defense stipulated to Nevils's prior felony conviction, and did not attempt to rebut testimony that the weapons and ammunition had traveled in interstate commerce. Rather, the defense pursued a theory that Nevils could not have known of the loaded firearms because he was drunk and asleep.

To support this theory, Nevils offered the testimony of Jonnetta Campbell. Campbell testified that in the early afternoon of April 14, she and Nevils attended a baby shower for a friend. After the baby shower ended, she, Nevils, and several other people lingered to drink alcohol (in Nevils's case, "a lot" of Remy Martin). Sometime after dark, though Campbell could not remember exactly when, Nevils got "[r]eal drunk," to the point that "[h]e couldn't stand." Campbell and two female friends carried Nevils into Apartment 6 and laid him on his side on the couch. Campbell testified that she saw no firearms or drugs in the apartment when she left Nevils there, and that she and her friends closed the front door to Apartment 6 when they departed. On cross examination, Campbell clarified that at no time did she see Nevils "passed out," that

she continued drinking after leaving Nevils in Apartment 6, and that she did not have any further interaction with him that evening.

During the jury charge, the jury was permitted to hold and examine the firearms that had been found on or near Nevils's body in Apartment 6, as well as the ammunition with which they were loaded. The jurors examined that evidence again during their deliberations. After three days of deliberations, the jury returned a unanimous verdict, finding Nevils guilty of the single count of possession with which he was charged.

The district court sentenced Nevils to 77 months' imprisonment, at the lowest limit of the applicable range specified by the Sentencing Guidelines. During the sentencing hearing, the district court discussed the need to avoid unwarranted sentence disparities among defendants. The court noted that there was possibly a "difference in the sentence the defendant might have received in state court for the same offense and the sentence in federal court," but stated that "[w]e're not permitted to consider the state court [sentence] when we impose our [sentence]." Defense counsel did not raise any objection to this ruling.

Nevils filed a timely notice of appeal, raising two issues. First, Nevils argues that the government failed to produce evidence sufficient to prove every element of his crime beyond a reasonable doubt. Second, Nevils contends that the district court erred in refusing to consider analogous state sentences in its calculations, and therefore the sentence imposed by the district court was unreasonable. We address these contentions in turn.

## II

**[1]** The federal felon-in-possession statute makes it unlawful for a person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one

year" to "possess in or affecting commerce, any firearm or ammunition" which "has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). Conviction under this provision requires that the government prove three elements: "(1) that the defendant was a convicted felon; (2) that the defendant was in knowing possession of a firearm [or ammunition]; and (3) that the firearm [or ammunition] was in or affecting interstate commerce." *United States v. Beasley*, 346 F.3d 930, 933-34 (9th Cir. 2003). "To establish that a defendant acted 'knowingly,' the prosecution need not prove that the defendant knew that his possession of a firearm was unlawful; the prosecution need only prove that the defendant consciously possessed what he knew to be a firearm." *Id.* at 934. For purposes of this appeal, Nevils contests only this element of knowledge. According to Nevils, the government failed to prove beyond a reasonable doubt that he knowingly possessed the firearms and ammunition at issue because there was insufficient evidence to establish that he was aware of the loaded firearms found on or near his body in the apartment.

## A

**[2]** Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. at 319, which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*; *see also McDaniel v. Brown*, 130 S. Ct. 665, 673 (2010) (reaffirming this standard*). Jackson* thus establishes a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. This means that a court of appeals may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial. *See id.* at 318-19. Rather, when "faced with

a record of historical facts that supports conflicting infer-ences" a reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326; *see also McDaniel*, 130 S. Ct. at 673-74.

**[3]** Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must deter-mine whether this evidence, so viewed, is adequate to allow "*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. This second step protects against rare occasions in which "a properly instructed jury may . . . convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]" *Id.* at 317. More than a "mere modicum" of evidence is required to support a verdict. *Id.* at 320 (reject-ing the rule that a conviction be affirmed if "some evidence" in the record supports the jury's finding of guilt). At this sec-ond step, however, a reviewing court may not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," *id.* at 318-19 (quoting *Woodby v. INS*, 385 U.S. 276, 282 (1966)) (internal quotation marks omitted), only whether "*any*" rational trier of fact could have made that finding, *id.* at 319.

Because the government does not need to rebut all reason-able interpretations of the evidence that would establish the defendant's innocence, or "rule out every hypothesis except that of guilt beyond a reasonable doubt" at the first step of *Jackson*, *id.* at 326, a reviewing court may not ask whether a finder of fact could have construed the evidence produced at trial to support acquittal.[2] Only after we have construed all the

---

[2]Indeed, at step one of *Jackson*, the Supreme Court has given little weight to a defendant's innocent explanation of the evidence. In *Wright v. West*, 505 U.S. 277 (1992), for example, all the justices agreed "there was more than enough evidence" to support the defendant's conviction for

evidence at trial in favor of the prosecution do we take the second step, and determine whether the evidence at trial, including any evidence of innocence, could allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Id.* at 319. At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt. *See id.*

Over the years, we have struggled with the correct approach to construing evidence produced at trial, in accordance with the first step of *Jackson*. Almost three decades before *Jackson*, we reached a conclusion directly contrary to its holding, namely that "evidence is insufficient to sustain [a] verdict . . . if we can conclude as a matter of law that reasonable minds, as triers of the fact, must be in agreement that reasonable hypotheses other than guilt could be drawn from the evidence." *Stoppelli v. United States*, 183 F.2d 391, 393 (9th Cir. 1950). Under this rule, if a reasonable finder of fact could construe the evidence at trial in a manner that supported the defendant's innocence, the verdict could not stand. *Id.* Following *Stoppelli*, we frequently invoked this test, holding that convictions must be reversed unless "reasonable minds could find the evidence excludes every hypothesis but that of guilt." *United States v. Nelson*, 419 F.2d 1237, 1243 (9th Cir. 1969) (internal quotation marks omitted) (citing cases).

_____

grand larceny under *Jackson,* although the only evidence produced by the state was that stolen items had been discovered in the defendant's home, and the defendant testified that he had bought the goods from various flea markets in which he regularly bought and sold merchandise. *Id.* at 295 (Thomas, J., joined by Rehnquist, C.J. and Scalia, J.); *see also* id. at 297 (White, J., concurring in the judgment); *id.* (O'Connor, J., joined by Blackmun and Stevens, JJ., concurring in the judgment); *id.* at 310 (Kennedy, J., concurring in the judgment); *id.* (Souter, J., concurring in the judgment). The jury was entitled to infer under state law that the person who possessed stolen goods was the thief, and "to disbelieve [the defendant's] uncorroborated and confused testimony" to the contrary. *Id.* at 296.

In *United States v. Nelson,* however, we abandoned this approach, on the ground that it had been rejected by the Supreme Court in *Holland v. United States* as "confusing and incorrect." 419 F.2d at 1243-44 (quoting *Holland*, 348 U.S. 121, 140 (1954)). *Nelson* noted that the approach adopted in *Stoppelli* had led "to serious departures from the proper appellate role in evaluating the sufficiency of evidence," because reviewing courts were invited to "divide the evidence into separate lines of proof, and analyze and test each line of proof independently of others." *Id.* at 1245. As a result, "[t]he sufficiency of the evidence is often tested against theoretical and speculative possibilities not fairly raised by the record, and inferences are sometimes considered which, though entirely possible or even probable, are drawn from evidence which the jury may have disbelieved." *Id.*

Instead, *Nelson* held that a court reviewing the sufficiency of evidence must determine whether "there is 'relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt, that the accused is guilty.' " *Id.* at 1242 (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 787 n.4 (1946)). The reviewing court must "inquire whether the evidence, considered most favorably to the government, was such as to permit a rational conclusion by the jury that the accused was guilty beyond a reasonable doubt." *Id.* As we subsequently explained, "[i]n determining the sufficiency of circumstantial evidence, the question is not whether the evidence excludes every hypothesis except that of guilt but rather whether the trier of fact could reasonably arrive at its conclusion." *United States v. Eaglin*, 571 F.2d 1069, 1076 (1977) (internal quotation marks omitted). Although *Nelson* predated *Jackson* by a decade, the test we adopted in *Nelson* was consistent with that ultimately mandated by *Jackson*.

**[4]** Notwithstanding the Supreme Court's decision and our own precedent, we subsequently strayed from our obligation under step one of the *Jackson* standard to construe the evidence at trial in the light most favorable to the prosecution,

returning instead to an approach similar to that of *Stoppelli*. This process began in *United States v. Bishop*, 959 F.2d 820 (9th Cir. 1992), which indicated that a reviewing court must consider whether the evidence at trial was susceptible to an innocent interpretation, and then determine whether a reasonable juror "could choose the hypothesis that supports a finding of guilt rather than hypotheses that are consistent with innocence." *Id.* at 830. Applying this approach, *Bishop* determined that the defendant's behavior was "perfectly consistent with that of an innocent person," and therefore the government failed to prove its case. *Id.* at 831 (quoting *United States v. Penagos*, 823 F.2d 346, 349 (9th Cir.1987)). By construing the evidence in favor of an innocent explanation, and determining if such an explanation was equally or more reasonable than the government's incriminating explanation, *Bishop* misapplied the first step of *Jackson*, which limits the reviewing court to construing the evidence in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319, 326. Only at the second step of *Jackson* does the reviewing court determine whether *any* rational juror could hold that the evidence, construed in favor of the prosecution, establishes guilt beyond a reasonable doubt. *Id.* at 319.

Some subsequent cases have followed *Bishop*, and similarly considered whether evidence at trial could be construed in a manner that supports innocence, contrary to the first step of *Jackson*. In *United States v. Vasquez-Chan*, 978 F.2d 546, 548-49 (9th Cir. 1992), for instance, we considered the sufficiency of the evidence to support the convictions of two defendants found guilty of conspiracy to sell cocaine. The evidence introduced at trial established that one defendant knew that the cocaine was stored in her bedroom and that her fingerprints were found on six of the cocaine storage containers, including one print inside of a container. *Id.* at 549. We determined that the evidence could be construed in a manner supporting innocence, explaining that "it is reasonable to assume that [the defendant] touched [the containers] at some time, including on one occasion the inside lid of a cannister, as she

passed in and out of the room or made space in the small bed-
room so that she and her infant child could have a comfort-
able place in which to sleep." *Id.* at 551. Again, this approach
misapplied the first step of *Jackson*, which limits us to con-
struing the evidence in a manner favoring the prosecution.
Based on this error, we then concluded at the second step of
*Jackson* that the government had failed to "establish [the
defendant's] guilt beyond a reasonable doubt" because the
"evidence presented at [defendant's] trial did not establish any
reason to believe that an innocent explanation of that evidence
was any less likely than the incriminating explanation
advanced by the government." *Id.* at 551. We have made the
same misstep in construing the evidence produced at trial in
cases following *Vasquez-Chan*. *See, e.g.*, *United States v.
Wiseman*, 25 F.3d 862, 866-67 (9th Cir. 1994) (holding that
the evidence was insufficient to convict the defendant, in part
because "the only evidence submitted by the government is
wholly susceptible to innocent explanations"); *United States
v. Corral-Gastelum*, 240 F.3d 1181, 1184-85 (9th Cir. 2001)
(reversing drug-trafficking conviction based in part on the
reviewing court's exculpatory construction of evidence). As
*Nelson* warned, considering whether the evidence produced at
trial may be innocently explained has led reviewing courts to
"divide the evidence into separate lines of proof, and analyze
and test each line of proof independently of others," to test the
sufficiency of the evidence "against theoretical and specula-
tive possibilities not fairly raised by the record," and to rely
on hypotheses "drawn from evidence which the jury may
have disbelieved." *Nelson*, 419 F.2d at 1245; *see, e.g.*,
*Vasquez-Chan*, 978 F.2d at 551-52.

The Supreme Court's recent decision in *McDaniel v.
Brown*, reversing a decision by this court, highlights our error.
130 S. Ct. at 673-74. *In McDaniel*, the defendant had been
convicted of sexual assault of a child. *Id.* at 666. On appeal,
we concluded that the evidence was insufficient to establish
defendant's guilt beyond a reasonable doubt. *See Brown v.
Farwell*, 525 F.3d 787, 797-98 (9th Cir. 2008). In so holding,

we discounted the government's argument that the defendant had washed his clothes when he returned home in order to destroy physical evidence of the rape, stating that while the government's theory was "plausibly consistent with him being the assailant," the defendant had provided an alternative reason for washing his clothes. *Id.* at 797. The Supreme Court rejected this analysis, holding that had we reviewed the evidence as required by *Jackson*, we would have concluded that "the evidence supports an inference that [defendant] washed the clothes immediately to clean blood from them," rather than adopting an exculpatory explanation. *McDaniel*, 130 S. Ct. at 674. The Court concluded that "the Court of Appeals' analysis failed to preserve 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *Id.* (alteration in original) (emphasis omitted) (quoting *Jackson*, 443 U.S. at 319).

**[5]** Accordingly, to the extent *Bishop* and its progeny construed evidence in a manner favoring innocence rather than in a manner favoring the prosecution, and required reversal when such a construction was not "any less likely than the incriminating explanation advanced by the government," *Vasquez-Chan*, 978 F.2d at 551, they strayed from the test established in *Jackson*, and made "plausible" exculpatory constructions disapproved of in *McDaniel v. Brown*. We now overrule them.

In reaching this conclusion, however, we acknowledge our obligation under *Jackson* to identify those rare occasions in which "a properly instructed jury may . . . convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt[.]" *Jackson*, 443 U.S. at 317. Although *Jackson* requires the reviewing court initially to construe all evidence in the favor of the government, the evidence so construed may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt. Moreover, the evidence construed in favor of the government may be insuffi-

cient to establish every element of the crime. We have held, for example, that evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, *see Juan H. v. Allen*, 408 F.3d 1262, 1277-79 (9th Cir. 2005), or where there is a "total failure of proof of [a] requisite" element, *Briceno v. Scribner*, 555 F.3d 1069, 1079 (9th Cir. 2009). Further, we have long held that evidence of mere proximity to contraband, or association with a person having possession of such contraband, is insufficient standing alone to support a finding of possession of that contraband. *See United States v. Chambers*, 918 F.2d 1455, 1459 (9th Cir. 1990); *see also Arellanes v. United States*, 302 F.2d 603, 606 (9th Cir. 1962).

We consider Nevils's challenge to the sufficiency of the evidence in his case pursuant to these principles.

## B

Nevils claims the evidence produced at trial was insufficient to prove his guilt beyond a reasonable doubt for two reasons. First, Nevils asserts that the government failed to prove every element of its case because Nevils presented an innocent explanation for his actions at trial: namely, that he was merely present in Apartment 6, rather than knowingly in possession of any of the contraband found on and around him. Second, Nevils argues that the evidence was insufficient to sustain a finding that he had knowledge of the loaded firearms in his possession, because uncontroverted evidence indicated he was incapacitated by alcohol when he entered the apartment and asleep at the time officers found him.

## 1

We first turn to Nevils's argument that the evidence produced at trial was not sufficient to eliminate the possibility that he was merely present in the apartment. Under our case law, as noted above, if evidence produced at trial established

only Nevils's presence in the vicinity of contraband, it would be insufficient standing alone to support a finding of knowing possession of firearms and ammunition beyond a reasonable doubt. *See Chambers*, 918 F.2d at 1459; *see also United States v. Sanchez-Mata*, 925 F.2d 1166, 1169 (9th Cir. 1991) (holding that knowledge that drugs are present in a car is not enough to prove involvement in a drug conspiracy); *United States v. Behanna*, 814 F.2d 1318, 1320 (9th Cir. 1987) ("When the government charges an individual with possession of a weapon in a vehicle, we have squarely held that the government must do more than show that the defendant was present as a passenger in the vehicle and within reach of the weapon.").

**[6]** On the other hand, evidence that shows more than mere presence is sufficient to support a finding of knowing possession of contraband. For example, in *United States v. Gutierrez*, 995 F.2d 169 (9th Cir. 1993), we affirmed a defendant's conviction for firearm possession under 18 U.S.C. § 922(g)(1) where a firearm was found in the seat below each passenger (including defendant) and officers testified that they saw the defendant make "suspicious or furtive movements inside the car." 995 F.2d at 172 (internal quotation marks omitted). After noting that "[i]t would tax credulity to assert that [defendant] was sitting on top of a pistol without knowing of its presence, or that he just happened to be a passenger in an automobile equipped with a pistol for each passenger, and that he knew nothing of that odd coincidence," and considering the officers' testimony that they witnessed defendant's "furtive movements," we held that the "jury had ample evidence to support its finding" that the defendant had possession of the weapons. *Id.* at 171-72; *see also United States v. Carrasco*, 257 F.3d 1045, 1048-50 (9th Cir. 2001) (holding that the jury did not plainly err in finding that defendant knowingly possessed shotgun shells left in plain view in the car he owned, along with other items such as drugs, money, and baggies that were known to be used "for the packaging and sale of

drugs"); *United States v. Terry*, 911 F.2d 272, 279-80 (9th Cir. 1990).

Here, Nevils argues that the evidence introduced at trial shows only his presence in the apartment, and is consistent with the innocent explanation that third parties entered Apartment 6 while Nevils slept, and then left their loaded firearms and drugs behind when they became aware of police in the vicinity. Nevils notes that the government did not introduce any evidence of fingerprints tying him to the loaded firearms, drugs, or any other item in Apartment 6. Nevils also points to the officers' testimony that the apartment was unsecured and located in a high-crime neighborhood, where drugs and firearms were presumably abundant. Nevils contends that because the government did not rebut his innocent explanation, and because this theory is as likely to be true as the theory that Nevils was aware of the loaded firearms found on his body, the government failed to make its case.

**[7]** We begin by viewing the evidence produced at trial in the light most favorable to the prosecution, as required by the first step of *Jackson*. Viewing the evidence in this light, it is sufficient to support a reasonable conclusion that Nevils knew he possessed firearms and ammunition. Nevils's actual possession of two loaded weapons, each lying on or against Nevils's body, would permit a reasonable juror to infer that Nevils knew of those weapons. *See United States v. Hernandez*, 476 F.3d 791, 797 (9th Cir. 2007) (indicating that evidence that defendant was found with a package of methamphetamine on his person was "overwhelming evidence" that the defendant "was guilty of at least possession of methamphetamine"). Further, Nevils initially reached toward his lap when the officers first awakened him, raising the inference that he knew a loaded weapon was within reach. Nevils later cursed his cohorts who had left him in this compromising situation without warning him that the police were in the vicinity. Finally, and contrary to Nevils's representations, there was evidence tying Nevils to the particular apartment

where he was found: Nevils had been arrested on narcotics and firearms charges in the same apartment just three weeks earlier. This evidence, construed in favor of the government, raises the reasonable inference that Nevils was stationed in Apartment 6 and armed with two loaded firearms in order to protect the drugs and cash in the apartment when he fell asleep on his watch. At this step of *Jackson*, we do not construe the evidence in the light most favorable to innocence, and therefore do not consider Nevils's argument that there is an equally plausible innocent explanation for the loaded firearms lying on and near his body. *See McDaniel*, 130 S. Ct. at 673-74.

[8] Moving to the second step of *Jackson*, we must consider whether the evidence, as construed above, is sufficient to allow any rational juror to conclude that the government has carried its burden of proof. As discussed above, the evidence shows more than Nevils's mere presence in the apartment, and reasonably supports the conclusion that Nevils was aware of the loaded firearms on or near his body. Nevils has not pointed to evidence so supportive of innocence that no rational trier of fact could find guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 317. We conclude that a rational juror could find beyond a reasonable doubt that Nevils had knowledge of the weapons in his possession. *See id.* at 319; *see also Gutierrez*, 995 F.2d at 171-72.

**2**

We next turn to Nevils's argument that a reasonable juror could not find that he knowingly possessed the loaded firearms in the apartment because evidence introduced at trial established that there were no firearms in the apartment when he arrived there, and Nevils was sleeping from the time he entered the apartment until the time officers arrived. Specifically, Nevils contends that the government did not rebut the testimony of Jonnetta Campbell, who indicated that Nevils

was incapacitated on the afternoon of the 14th when she left him in Apartment 6, which at the time was empty.

**[9]** Even assuming that Campbell's testimony established that Nevils was sleeping when she left him in the apartment (although on cross-examination, she stated that Nevils never "passed out"), at the first step of *Jackson* we must recognize the jury's entitlement to disbelieve her. *See Jackson*, 443 U.S. at 326. The issue of Campbell's credibility was argued to the jury by both defense and government counsel. Defense counsel emphasized that Campbell was "not sophisticated," and simply came to court because "she had a story to tell." In response, the government argued at length that Campbell was not credible: she had been unable to answer specific questions on cross-examination regarding the time of the baby shower and the people in attendance, and had admitted that she drank heavily both before and after her interaction with Nevils. We cannot second-guess the jury's credibility assessments; rather, "under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." *Schlup v. Delo*, 513 U.S. 298, 330 (1995); *see also United States v. Cluchette*, 465 F.2d 749, 754 (9th Cir. 1972) ("It is not our function to reweigh the evidence and pass on the credibility of the witnesses."). Assuming (as we must, at this first step of *Jackson*) that the jury disbelieved Campbell's testimony, it could reasonably have rejected Nevils's theory that he was sleeping from the time he entered the apartment to the time the officers arrived, and also disbelieved that there were no firearms or drugs in the apartment when Nevils arrived. Even though Nevils was asleep when discovered by the officers, the jury could have reasonably inferred that Nevils fell asleep while on duty. *Cf. United States v. Thongsy*, 577 F.3d 1036, 1042 (9th Cir. 2009) (affirming that defendant had "knowledge and control" of a firearm for purposes of 18 U.S.C. § 924(c) where the defendant was found asleep in a tent with a "semi-automatic pistol lying on his sleeping bag at waist level, within reach," as a finder of fact could reasonably infer he was protecting a nearby marijuana farm). Accordingly, at the

second step of *Jackson*, we conclude that a rational juror could find beyond a reasonable doubt that Nevils knowingly possessed the firearms and ammunition found on or near his body, notwithstanding evidence that he was asleep.

**3**

**[10]** In sum, applying *Jackson*'s two-part test to the evidence produced at trial, we conclude that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Nevils knowingly possessed firearms and ammunition. We reject Nevils's invitation to construe the evidence in the light most favorable to his claim of innocence, because such an approach is foreclosed by *Jackson*. Accordingly, we affirm the denial of Nevils's motion for acquittal, and affirm his conviction under 18 U.S.C. § 922(g)(1).

**III**

Finally, we turn to Nevils's contention that his sentence was not reasonable because the district court stated it could not consider the sentence Nevils would have received if he had been convicted of the same conduct in state court. Nevils argues that the district court's decision was erroneous, because no case after *United States v. Booker*, 543 U.S. 220 (2005), explicitly prohibits a court from considering that factor. Nevils's counsel, however, failed to object to this alleged error at sentencing. Therefore, we review only for plain error. *United States v. Watson*, 582 F.3d 974, 981 (9th Cir. 2009). Plain error is: "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* If all three conditions are met, an appellate court may then exercise its discretion to address a forfeited error, but only if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation mark omitted).

**[11]** The district court did not plainly err in its sentencing determination. After *Booker*, we held that a district court did

not abuse its discretion in declining to consider the disparity between the recommended Guidelines sentence and the maximum sentence a defendant would receive if convicted of the same conduct in state court. *United States v. Ringgold*, 571 F.3d 948, 950-51 (9th Cir. 2009). We have not yet addressed the question whether, after *Booker*, a district court is prohibited from considering such disparity. Before *Booker*, however, we held that allowing district courts to consider state sentences "would undermine the goal of uniformity that Congress sought to ensure in enacting the Guidelines, because every federal sentence would become dependent upon the practice of the state within which the federal court sits." *United States v. Williams*, 282 F.3d 679, 682 (9th Cir. 2002). In light of these precedents, the district court's refusal to consider the state sentence for Nevils's offense was not plain error. Accordingly, we hold that Nevils's sentence was not substantively unreasonable.

**AFFIRMED.**