NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

OCT 2 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 15-50078 |
| Plaintiff-Appellee, | D.C. No. 5:12-cr-00092-VAP-1 |
| v. | |
| SOHIEL OMAR KABIR, | MEMORANDUM* |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, Chief District Judge, Presiding

Argued and Submitted December 13, 2019
Pasadena, California

Before: KELLY,** PAEZ, and BADE, Circuit Judges.
Dissent by Judge BADE

Sohiel Kabir ("Kabir") appeals his conviction for several terrorism-related

offenses stemming from a failed plot to join militants engaged with American

forces in Afghanistan. Kabir raises a number of challenges to various aspects of

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Paul J. Kelly, Jr., United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

his trial. We have jurisdiction under 18 U.S.C. § 1291. We affirm in part, reverse in part, and remand for resentencing.[1]

**1.** Kabir first challenges the sufficiency of the evidence underlying his convictions on Count 2 (conspiracy to provide material support to Al-Qa'ida, a foreign terrorist organization, 18 U.S.C. § 2339B), Count 4 (conspiracy to receive military-type training from Al-Qa'ida, 18 U.S.C. §§ 371, 2339D), and Count 5 (conspiracy to kill federal officers, 18 U.S.C. §§ 1117, 1114). We employ "a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, the evidence must be viewed "in the light most favorable to the prosecution." *Id.* Second, we must "determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1977) (emphasis in original)).

A. Counts 2 and 4

Taking the evidence in the light most favorable to the government, it does not satisfy the second part of the inquiry with respect to Counts 2 and 4, the Al-

---

[1] In a sealed memorandum filed concurrently with this memorandum, we affirm the district court's handling of classified information under the Classified Information Procedures Act, 18 U.S.C. App. 3. We also affirm the court's rulings on related objections at trial.

Qa'ida-specific charges. For these counts, the government bore the burden of proving beyond a reasonable doubt that Kabir conspired to provide material support to and receive military-type training from a State-Department-designated foreign terrorist organization. 18 U.S.C. §§ 371, 2339B(a)(1), 2339D(a).

Surveillance tapes established that Kabir had a series of conversations with his co-conspirators concerning which militant group they would ultimately join when they reached Afghanistan. While co-conspirator Deleon preferred the Taliban, co-conspirator Santana preferred Al-Qa'ida. Of these two groups, only Al-Qa'ida is a designated foreign terrorist organization.

Kabir was open to joining either organization. In his last communication with the stateside defendants, Kabir asked Santana if they had decided which group to join, and mentioned that he had met someone with "connects with AQ." Santana replied that they still needed to "figure this out." Kabir declined to assert a preference, instead telling the others to "talk amongst yourselves and see what's up and then let me know."

Witness testimony supports Kabir's argument that the group never agreed to join Al-Qa'ida. One cooperating defendant, Gojali, testified only that the group had plans to join the Taliban. When government counsel asked if they planned "to join the Taliban to ultimately progress . . . from students to the professors[,]" Gojali responded that he was "not sure[.]" Government counsel's next question

3

was less cryptic, asking whether the plan was "to join another group after the Taliban[.]" Gojali was again unsure. The FBI informant likewise testified that he only knew of a plan to join the Afghan Taliban. He never heard "any information about a concrete plan or concrete connections other than to the Taliban in Afghanistan[.]"

Although one could infer that Kabir was *willing* to join Al-Qa'ida, mere willingness is insufficient to support a conspiracy conviction. *United States v. Melchor-Lopez* is instructive in this regard. 627 F.2d 886 (9th Cir. 1980). In *Melchor-Lopez*, the defendants engaged in a series of negotiations and deliberations to potentially import narcotics. *Id.* at 891. Despite the defendants' extensive bargaining over the terms of the agreement and their obvious willingness to commit the drug offenses, we reversed their conspiracy convictions for insufficient evidence because there was no proof of a "meeting of the minds" between the conspirators. *Id.* at 892 (internal quotations omitted).

Here, like in *Melchor-Lopez*, the conspirators did not agree on an illegal transaction. That is, they did not agree to join Al-Qa'ida. Instead, the conspirators openly weighed the pros and cons of joining either the Taliban or Al-Qa'ida. The government's argument—that Kabir entered an "unqualified agreement" to start with the Taliban and "move on" to Al-Qa'ida—is not supported by the record evidence. This is evident in the contents of the October 20 conversation, in which

4

Kabir told Santana and the others to pick "one or the other" of the Taliban or Al-Qa'ida. Although there are other references to Al-Qa'ida throughout the record, when all the evidence is considered, no reasonable juror could find beyond a reasonable doubt that Kabir and his co-conspirators agreed to join or obtain training from Al-Qa'ida.

B. Count 5

Although the government presented insufficient proof of the Al-Qa'ida-specific conspiracies, the evidence underlying Kabir's conspiracy-to-kill conviction is stronger. Gojali's testimony showed that he and the other conspirators planned to travel to Afghanistan to wage war against American soldiers. Likewise, in a recorded call with Deleon, Kabir made cryptic references to his plans to go on a "one way trip" involving the "third letter and the fourth number" (presumably a reference to C-4 explosives). The jury could have reasonably interpreted these comments as reflecting Kabir's intent to commit a suicide bombing. Viewing the evidence in the light most favorable to the government, there was ample evidence to support the conspiracy-to-kill conviction on Count 5.

**2.** Kabir next contests the district court's exclusion of statements made by military interrogators who interviewed him in the days following his arrest. Kabir argues that the interrogators' reports (or at least portions of them) were not hearsay

5

under Federal Rule of Evidence 801(d)(2) and were relevant to determining his lack of criminal intent.

We need not determine whether the district court erred in excluding the reports because Kabir has not shown that he was prejudiced. While certain portions of the interrogators' reports tended to bolster his defense theory—that he had no actual ties to terrorist groups—the reports as a whole tended to inculpate him. Indeed, the reports document Kabir's "interest[] in conducting a suicide operation" and indicate that he "request[ed] his old Air Force uniforms" to infiltrate an American military base. Any error was thus harmless beyond a reasonable doubt. *See United States v. Larson*, 495 F.3d 1094, 1108 (9th Cir. 2007) (en banc).

**3.** Kabir additionally argues that the district court should have declared a mistrial when several jurors related to the court their concerns with the actions of a courtroom observer who was a volunteer on his defense team. The jurors reported fearing for their safety because the volunteer appeared to be closely scrutinizing them and taking notes.

A defendant's "Sixth Amendment rights are violated even if only one juror was unduly biased or improperly influenced." *United States v. Sarkisian*, 197 F.3d 966, 981 (9th Cir. 1999). Any "private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the

6

jury is, for obvious reasons, deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954). To dispel the presumption of prejudice, the government must show that "there is no reasonable possibility that [any juror] was . . . affected in his freedom of action as a juror[.]" *United States v. Dutkel*, 192 F.3d 893, 899 (9th Cir. 1999) (internal quotations omitted, ellipses in original).

The government successfully rebutted the presumption in this case. Kabir's argument to the contrary is not persuasive. The district court properly responded to the jurors' fears by individually questioning them and assuaging them of their safety concerns. *See Sarkisian*, 197 F.3d at 982 (holding that the district court "adequately dispelled any prejudice by telling the jurors in open court that the [perceived threat] was a prank, and by individually questioning the jurors to make sure that they could proceed impartially"). The court did not abuse its discretion in crediting the jurors' claims that they could be fair in their assessment of the case. *See United States v. Stinson*, 647 F.3d 1196, 1216 (9th Cir. 2011).

**4.** Kabir next contends that the district court abused its discretion and violated his constitutional right to present a defense when it excluded the testimony of his expert witness, Dr. Victoroff. But, as with the other alleged evidentiary errors, Kabir's argument fails because any error in excluding Dr. Victoroff's testimony was harmless beyond a reasonable doubt. *Larson*, 495 F.3d at 1108.

**5.** Finally, Kabir argues that the district court erred in admitting several

statements by his co-conspirators. Kabir contends that these statements were inadmissible hearsay because they were not made "in furtherance" of the conspiracy, as required under Federal Rule of Evidence 801(d)(2)(E).

"We review a decision to admit co-conspirator statements for abuse of discretion, and the factual determination that statements were made in furtherance of a conspiracy for clear error." *United States v. Bowman*, 215 F.3d 951, 960 (9th Cir. 2000) (citing *United States v. Gil*, 58 F.3d 1414, 1419 (9th Cir. 1995)). Applying this standard, we discern no error in the district court's admission of the co-conspirators' statements. Although some of the statements seem only tenuously related to the conspiracy, the district court is afforded wide latitude in determining whether a statement was made in furtherance of the charged conspiracy. *United States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991).

Accordingly, we reverse Kabir's convictions as to Counts 2 and 4 with instructions to enter a judgment of acquittal on those counts, but affirm his remaining convictions in all other respects.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for resentencing.

*United States of America v. Sohiel Omar Kabir*, No. 15-50078

BADE, Circuit Judge, dissenting to Section 1(A):

The majority concludes that the government failed to prove beyond a reasonable doubt that Kabir conspired to provide material support to, and receive military-type training from, Al-Qa'ida, a State Department-designated foreign terrorist organization (Counts Two and Four). *See* 18 U.S.C. §§ 371, 2339B(a)(1), 2339D(a). But the evidence is more than sufficient to support Kabir's convictions on both these Counts.

Kabir and his co-conspirators explicitly discussed whom they would be "fighting with" in Afghanistan in a series of conversations captured on surveillance tapes. In one such conversation, when asked "which group" the men "should get involved with," co-conspirator Santana responded with "AQ" and confirmed that Al-Qa'ida was his first choice. During another conversation between Kabir, Santana, and two other co-conspirators (including Deleon), in which the group discussed joining Kabir in Afghanistan to engage in jihad, Kabir told the group, "Everything here is good to go if you guys come out here." In that conversation, Kabir agreed with Santana's suggestion that they could advance from the "students" (the Taliban) to the "professors" (Al-Qa'ida), showing that Kabir agreed to ultimately join and obtain training from Al-Qa'ida. After this conversation, Santana and Deleon explained to another co-conspirator that the plan was to

1

initially train with the Taliban but then go to Al-Qa'ida to "train with them." Consistent with this plan, Kabir later stated that he had met someone with "connects with AQ."

Moreover, at trial, co-conspirator Gojali testified that he and the other co-conspirators planned to meet up with Kabir in Afghanistan to "fight" the "American soldiers, British, Australian, UN," and "go to war." Another co-conspirator testified that "the plan" was to "go and join the Taliban and fight until we get[] the chance to be with Al-Qa'ida." Gojali's trial testimony also established that he, Santana, and Deleon prepared themselves for military-type training and combat in Afghanistan by practicing with AK-47s at shooting ranges, going to paintball ranges where they would pretend that people in camouflage were "the American soldiers and the British soldiers," and by hiking and training in the gym in preparation for Afghanistan's terrain and for carrying weapons and dead bodies. Gojali even confirmed that he intended to use the AK-47 "to kill American soldiers."

Also at trial, the government's expert explained that Osama Bin Laden's first fatwa—a religious political edict—called for violent jihad against U.S. military personnel, and how Al-Qa'ida used online propaganda to encourage people to travel on their own to join the jihad. This expert testimony was presented to the jury to consider along with other evidence establishing Kabir's

2

longstanding interest in violent jihad, including: years of publicly praising terrorism against the United States; attempting to contact Anwar Al-Awlaki (a former Yemeni-American cleric who encouraged violent jihad through English publications directed at Muslims in the United States and other western countries); converting Deleon and Santana to radical Islam and shepherding them into extremist beliefs; and moving to Afghanistan after years of expressing interest in doing so. Kabir's commitment to Al-Qa'ida's mission of violent jihad was further demonstrated by his statements to Deleon confirming that he was "going on a one way trip" involving "the third letter and the 4th number"—a reference to C4. Kabir's statements and actions go far beyond demonstrating mere "willingness" to join Al-Qa'ida. *See United States v. Melchor-Lopez*, 627 F.2d 886, 888–89 (9th Cir. 1980).

Viewing the evidence "in the light most favorable to the prosecution," *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc), the jury could have reasonably found beyond a reasonable doubt that Kabir conspired to provide material support to, and receive military-type training from, Al-Qa'ida. *See United States v. Perlaza*, 439 F.3d 1149, 1177 (9th Cir. 2006) ("It is well-settled in this circuit that, once the existence of a conspiracy is established, a defendant may be convicted of knowing participation therein if the evidence establishes, beyond a reasonable doubt, 'even a slight connection between' the

3

defendants and the conspiracy." (quoting *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000))); *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997) ("[M]ost conspiracy convictions are based on circumstantial evidence, and [courts] allow juries to draw inferences as to the existence of an agreement from the defendants' conduct."). Because the majority ignores the ample evidence in the record that supports the jury's verdict on Counts Two and Four, and does not view the evidence "in the light most favorable to the prosecution," *Nevils,* 598 F.3d at 1164, I respectfully dissent in part.