**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-4306 |
| Plaintiff - Appellee, | D.C. No.<br>1:22-cr-00002-RVM-1 |
| v. | |
| BONIFACIO VITUG SAGANA, AKA Boni, | MEMORANDUM[*] |
| Defendant - Appellant. | |

Appeal from the United States District Court
for the District of the Northern Mariana Islands
Ramona V. Manglona, Chief District Judge, Presiding

Argued and Submitted February 12, 2025
Honolulu, Hawaii

Before: S.R. THOMAS, BRESS, and DE ALBA, Circuit Judges.

Bonifacio Sagana appeals his conviction and sentence for conspiring to produce an identification document without lawful authority, in violation of 18 U.S.C. § 1028(a)(1), (f). We have jurisdiction under 28 U.S.C. § 1291 and 48 U.S.C. § 1824(b). Because the parties are familiar with the history of this case, we

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

need not recount it here. We affirm.

I

There was sufficient evidence to sustain the convictions. Sufficiency of the evidence challenges to criminal convictions "require[] a court of appeals to determine whether 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review also applies to sufficiency of the evidence challenges of jurisdictional elements. *United States v. Morgan*, 238 F.3d 1180, 1185–86 (9th Cir. 2001).

There was sufficient evidence to conclude the driver's license was produced "without lawful authority." 18 U.S.C. § 1028(a)(1). An identification document is produced "without lawful authority" if the applicant provides false information to meet a requirement for obtaining the document. *See United States v. Turchin*, 21 F.4th 1192, 1197 (9th Cir. 2022). Multiple witnesses testified that a valid immigration status is required to obtain a Northern Mariana Islands driver's license. Sagana produced Zata's license "without lawful authority" because he forged her immigration document to falsely show that she had one of the

immigration statuses required for a driver's license when she did not have a valid status.

There was also sufficient evidence that the production of the license affected interstate commerce. "Any charge of unlawful production of an identity document under § 1028(a)(1) requires a showing of a federal nexus," which can be satisfied by showing that "the prohibited production 'is in or affects interstate or foreign commerce.'" *Turchin*, 21 F.4th at 1198 (citing 18 U.S.C. §§ 1028(c)(1), (3)(A), (B)). "[W]hen Congress chooses to use the words 'affecting interstate commerce,' it intends 'to regulate to the outer limits of its Commerce Clause authority[.]'" *United States v. Tuan Ngoc Luong*, 965 F.3d 973, 981 (9th Cir. 2020) (second alteration in original) (quoting *United States v. Brown*, 785 F.3d 1337, 1351 (9th Cir. 2015)). There is a sufficient federal nexus even when the connection to interstate commerce is "potentially modest and indirect." *Turchin*, 21 F.4th at 1203.

Here, the interstate commerce element is supported by substantial evidence because a driver's license allows Zata to drive, and thus to affect interstate commerce by purchasing imported gasoline. After Sagana helped Zata renew her license, she used her license to drive, and consequently purchased gasoline. That gasoline must have been imported, because all gasoline on the Northern Mariana

3

Islands is imported. By buying imported gasoline, she either participated directly in interstate commerce, or at the very least indirectly increased the demand for imported gasoline, and thus her actions had at least a "modest and indirect" effect on interstate commerce. *See id.*

## II

The district court did not err in denying the motion for a new trial based on pretrial publicity. "Perhaps to the misfortune of everyone involved in the judicial process, no precise rule prescribes the type of voir dire examination which is necessary to protect against prejudicial pretrial publicity." *United States v. Giese*, 597 F.2d 1170, 1183 (9th Cir. 1979). "The appropriate scope and detail of the voir dire depend on the level of pretrial publicity and the discretion of the district court." *Id.* "[A] district court is in a far better position to gauge the impact of adverse publicity on a jury than [the circuit court is]." *United States v. Waters*, 627 F.3d 345, 363 (9th Cir. 2010). "Unless a trial judge clearly has erred in his estimation of the action needed to uncover and prevent prejudice from pretrial publicity, an appellate court should not intervene and impose its estimate." *United States v. Polizzi*, 500 F.2d 856, 880 (9th Cir. 1974).

In cases with great pretrial publicity, the district court must take greater precautions. *See Giese*, 597 F.2d at 1183. In cases with less pretrial publicity, the

4

district court may conduct a less rigorous voir dire. *Id.* But regardless of the level of pretrial publicity, the crux is whether the district court's procedures did enough to determine if potential jurors were biased by the publicity. *See id.*; *see also Silverthorne v. United States*, 400 F.2d 627, 631 (9th Cir. 1968) ("We are not concerned with the fact of publicity but with the assessment of its nature.").

Here, the voir dire was adequate, because the district court's questioning did enough to determine that potential jurors were unbiased by media coverage. Just like in *Giese*, where the court determined that most potential jurors had little to no knowledge of the case by asking half of the jury pool about media exposure, 597 F.2d at 1184, here the court determined through questioning all three panels that few potential jurors—five total —had any media exposure to the case. Just like in *Polizzi*, where the potential jurors' answers to questions about media exposure gave little indication of possible bias, 500 F.2d at 879–80, here the trial judge individually questioned the five potential jurors who did have media exposure, finding that all had little memory of the media coverage and no resulting bias.

These procedures make the voir dire here unlike that in *Waters*. There, the trial judge asked only a "general, compound" question to the whole jury pool, and did not follow up with any individual jurors. *See* 627 F.3d at 364. Here, the trial judge asked each jury panel separately, and followed up with individual jurors who

5

reported possible media exposure. And here, the trial judge even asked jurors about media exposure a second time after reviewing the indictment with them.

Because the voir dire was adequate, it was not an abuse of discretion to deny the motion for a new trial.

III

The district court did not commit reversible error in applying a two-level "organizer" sentencing enhancement. U.S.S.G. § 3B1.1(c) applies a two-level enhancement to criminal sentences if there is "evidence that the defendant [1] exercised some control over others involved in the commission of the offense or [2] was responsible for organizing others for the purpose of carrying out the crime." *United States v. Vinge*, 85 F.4th 1285, 1288 (9th Cir. 2023) (alterations in original) (quoting *United States v. Doe*, 778 F.3d 814, 823 (9th Cir. 2015)). A defendant is "responsible for organizing others for the purpose of carrying out the crime" when he has "the necessary influence and ability to coordinate the behavior of others so as to achieve the desired criminal result," even if he did not supervise others. *Doe*, 778 F.3d at 825–26. Thus, a defendant must have "organizational authority" but need not have "supervisory control." *Vinge*, 85 F.4th at 1288, 1289–90.

Organizing logistics for multiple participants is organizational authority.

6

*See, e.g., id.* at 1290 (finding organizational authority where the defendant "gathered up everybody's money, placed the order with his contact on the mainland, followed the tracking, picked up the packages, gave the drugs to the people on the island, and collected the proceeds") (simplified); *Doe*, 778 F.3d at 826 (finding organizational authority where defendant "coordinate[d] 'the procurement and distribution of drugs from numerous suppliers,' and . . . 'coordinat[ed] the activities of the other participants'") (quoting *United States v. Varela*, 993 F.2d 686, 691–92 (9th Cir. 1993)); *United States v. Kabir*, 51 F.4th 820, 826–27 (9th Cir. 2022) (finding organizational authority where defendant "told his co-conspirators what to pack, how to pack, how to train, what guns to use when practicing, [and] what sorts of physical training to undertake," and thus "instructed [his co-conspirators] in all aspects of their conspiracy to commit terrorist acts abroad, and he made concrete arrangements for them to travel to Afghanistan to fight against American soldiers") (first alteration in original), *cert. denied*, 143 S. Ct. 838 (2023).

Here, it was not an abuse of discretion to apply the "organizer" enhancement, because Sagana coordinated the logistics of Zata's participation in

the crime.[1]  Sagana told Zata to meet him at the courthouse, and to bring payment and her expiring driver's license. Sagana instructed Zata to wait for him while he was in the courthouse.  He later instructed Zata to follow him to the Bureau of Motor Vehicles, where Zata waited for her picture to be taken.  That is coordinating Zata's participation.

IV

In sum, we affirm the district court's judgment of conviction, denial of motion for a new trial, and sentence.

**AFFIRMED.**

---

[1] Sagana likely had no supervisory control over Zata because Zata freely approached Sagana about the crime, not the other way around.