# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

SEYED MAHMOOD MOUSAVI, AKA
Seyyed Mahmood Mousavi, AKA
Seyed Mahmoud Mousawi,
            *Defendant-Appellant.*

No. 08-50454

D.C. No.
2:07-CR-00513-
PA-1

OPINION

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted
March 1, 2010—Pasadena, California

Filed May 5, 2010

Before: Ronald M. Gould and Sandra S. Ikuta,
Circuit Judges, and Lloyd D. George,*
District Judge.

Opinion by Judge Ikuta

---

*The Honorable Lloyd D. George, United States District Judge for the
District of Nevada, sitting by designation.

.

## COUNSEL

George C. Harris, Morrison & Foerster LLP and Stacy Tolchin, Van Der Hout, Brigagliano & Nightingale, attorneys for the appellant.

Susan J. De Witt, Assistant United States Attorney, attorney for the appellee.

## OPINION

IKUTA, Circuit Judge:

Seyed Mahmood Mousavi appeals from his federal criminal convictions for, among other things, willfully providing services to Iran in violation of the International Economic Emergency Powers Act (IEEPA), 50 U.S.C. § 1705, and the Iranian Transaction Regulations (ITR), 31 C.F.R. § 560.206, commonly referred to as the United States' trade embargo against Iran. Mousavi argues that the evidence presented at trial was insufficient to allow any rational juror to conclude beyond a reasonable doubt that he was guilty of willfully violating the ITR. We conclude, viewing the evidence presented at trial in the light most favorable to the government, that evidence sufficiently supports Mousavi's conviction under 50 U.S.C. § 1705 and 31 C.F.R. § 560.206. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).[1]

## I

Mousavi immigrated to the United States from Iran in the late 1980s, becoming a legal permanent resident in 1991 and a naturalized citizen in 1999. At times relevant to this appeal, Mousavi and his wife owned Mousavi Digital Services, doing business as Global Digital Services, a partnership that installed television satellite systems. At the same time, Mou-

---

[1]Mousavi also appeals from his convictions for unlawfully procuring naturalization, 18 U.S.C. § 1425(a), making material false statements to government agents, 18 U.S.C. § 1001, willfully filing a false tax return, 26 U.S.C. § 7206(1), and corruptly endeavoring to obstruct administration of the Internal Revenue Code, 26 U.S.C. § 7212(a). Mousavi argues that evidence was insufficient to support these convictions, that the trial court committed plain error in instructing the jury, that he was deprived of effective assistance of counsel, and that the trial court erred in denying his motion to suppress evidence seized allegedly in flagrant disregard of the terms of a search warrant. We address these claims in a concurrently filed memorandum disposition.

savi was president of the Hejrat Educational Center, a non-profit organization that provided services to the Islamic community, and also ran a business that organized travel packages to Mecca for the Hajj pilgrimage by obtaining necessary visas and arranging flights, hotels, and meals.

In January 2006, agents of the Internal Revenue Service (IRS) discovered evidence of concealed income on Mousavi's 2002 personal and business tax returns. In the resulting investigation, agents found evidence that some of Mousavi's undisclosed income was from a Kuwaiti company, Al Mal Kuwaiti Company (Al Mal), which had entered into an agreement with Mousavi to provide consulting services related to business ventures in Iran. Based on this evidence, a grand jury returned an indictment against Mousavi in March 2008, charging him with, among other things, conducting unlawful dealings with Iran in violation of IEEPA and the ITR. 50 U.S.C. § 1705; 31 C.F.R. § 560.206. A jury trial commenced in district court in April 2008.

At trial, the government presented evidence showing that Mousavi contracted with Al Mal to provide consulting services directed at establishing business ventures in Iran. To that end, the government produced a document entitled "Agreement," signed by Mousavi and Mohammad Al Sager, Chairman and Managing Director of Al Mal, dated June 11, 2002, and two attached documents: one entitled "Incentive Plan," also dated June 11, 2002; and the other a letter from Al Mal's Assistant General Manager to Akbar Torkan, Chairman and Managing Director of Petroparts, Ltd. in Tehran, Iran, dated August 25, 2002.

The Agreement provides, in relevant part:[2]

The two parties agreed on the following:

---

[2]Errors appear in the original.

1. Al Mal will hire Mr. Mousavi (consultant) to help Al Mal in its endeavor to do the following:

   a) To bid for GSM license jointly with Iran Electronic Development Company.

   b) To help establishing a bank and leasing Co. with Industrial Development & Renovation Organization of Iran (IDRO).

2. The consultants responsibilities will be to follow up with the authorities and concern parties all required steps to help establish and accomplish our planed co-joint projects.

   . . .

4. Al Mal will hire the consultant for a period of six months for a remuneration of US\$ 50,000 (US \$ fifty thousand only) to be paid 50% in advance and 15% after reaching a Memorandum of Understanding (MOU) with each party with the last project getting an extra 5% (total 100%).

5. Al Mal will appoint Mr. Mousavi in one of company established jointly by the Iranian Partners.

   . . .

7. An incentive plan will be drafted and agreed upon separately in case that Mr. Mousavi accomplished any of the above joint companies.

The attached Incentive Plan provides for additional commissions to be paid in the event of success in several projects. For example, Section B(1) of the Incentive Plan provides: "Gravell Project: Al Mal will pay Mr. Mousavi after successfully completing the purchase of ship and establishing the company

jointly with the Iranian partner US$ 50,000." Section 3 states: "Also, Mr. Mousavi will be exclusive to Al Mal on Iran and will not approach other parties for these projects."

The attached letter from Al Mal to Petroparts references a meeting in Tehran regarding Al Mal's interest in investing in the Iranian market, and notes Al Mal's particular interest in "exploring further the feasibility of a project for commissioning a gas pipeline from the Republic of Iran (say, from Kharg Island) to Kuwait." In the letter, Al Mal nominates "Mr. Mahmoud Al Mousawi as our liaison for this project."

In addition to the Agreement, Incentive Plan, and letter, the government introduced evidence showing a course of dealings between Mousavi and Al Mal. The documents introduced at trial included Mousavi's Iranian and United States passports with stamps indicating travel to Kuwait and Iran in late April and early June 2002, as well as a boarding pass from Iran Air dated April 22, 2002, found in the same file as the Agreement. The government introduced bank statements showing wire transfers from Al Mal into Mousavi's personal account during the same time period. The statements showed transfers of $6,170 on April 17, $8,870 on June 6, and $30,000 on June 13, 2002, for a total of $45,040. Mousavi's 2002 personal tax return, also introduced by the government, did not report any income from Al Mal. Instead, it indicated a total income of only $11,152, all from Mousavi Digital Services.

Finally, the government presented evidence to demonstrate that Mousavi was a sophisticated businessman, whose ties to Iran and organization of travel in the area would have made him familiar with the United States' restrictions on trade with that country. This evidence included Mousavi's naturalization application and resume, indicating that Mousavi grew up in Iran and was engaged in business there during the period following the embargo. Mousavi had high-level contacts in Iran and continued to travel to Iran regularly after moving to the United States. In addition, evidence indicated that Mousavi

ran a business that provided travel packages to persons traveling to Mecca for the Hajj pilgrimage. In making travel arrangements for clients seeking to visit Iran as part of their pilgrimage, Mousavi sought visas from the Pakistani embassy; using that embassy is required, the government's witness testified, because there is no Iranian embassy in the United States as a result of the trade embargo and diplomatic sanctions. Mousavi likewise was forced to coordinate his own and others' travel to Iran through third-party countries (e.g. Kuwait) because there are no direct flights to Iran from the United States as a result of the embargo.

Also at trial, an employee of the Treasury Department's Office of Foreign Assets Control (OFAC), the agency charged with administering the ITR, testified that, in his opinion, dealings such as those reflected in the Agreement would be a violation of the ITR absent a license from OFAC. The OFAC employee testified that Mousavi never applied for or received a license to conduct such business with Iran.

Following the close of the government's case, Mousavi moved under Federal Rule of Civil Procedure 29 for a directed verdict, arguing that the evidence was insufficient to support the charges against him. Specifically, the defense argued that the government failed to provide sufficient evidence that Mousavi violated the ITR, or (if he did so) failed to prove that he acted willfully. The court reserved ruling on the motion until after the verdict. The defense presented no evidence.

The jury returned a guilty verdict on all counts. Defense counsel renewed his motion under Rule 29, which the court denied as to Mousavi's convictions under IEEPA and the ITR. Mousavi filed a timely notice of appeal, contending that evidence presented at trial was constitutionally insufficient to support his conviction.

## II

We begin with a review of the relevant law. IEEPA authorizes the President to "deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States . . . ." 50 U.S.C. § 1701(a). In relevant part, it authorizes the President to impose trade embargoes against foreign countries with which the United States has engaged in hostilities. *See id.* § 1707(a). A violation of an embargo imposed under IEEPA is a criminal offense. Specifically, § 1705(a) provides that it is "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation or prohibition issued under this chapter." *Id.* § 1705(a). One who commits or attempts to commit such a violation "willfully" can be fined or imprisoned. *Id.* § 1705(c).[3]

In response to the seizure of the American Embassy in Tehran in 1979, President Carter issued a series of Executive Orders authorizing OFAC to promulgate regulations blocking transactions with Iran. *Dames & Moore v. Regan*, 453 U.S. 654, 662-63 (1981). Consequently, OFAC promulgated the ITR, which provide, in relevant part:

> (a) Except as otherwise authorized pursuant to this part . . . no United States person, wherever located, may engage in any transaction or dealing in or related to:
>
>> (1) Goods or services of Iranian origin or

---

[3]50 U.S.C. § 1705(c) provides, in full: "A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids and abets in the commission of, an unlawful act described in subsection (a) of this section shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both."

owned or controlled by the Government of Iran; or

(2) Goods, technology, or services for exportation, reexportation, sale or supply, directly or indirectly, to Iran or the Government of Iran.

(b) For purposes of paragraph (a) of this section, the term transaction or dealing includes but is not limited to purchasing, selling, transporting, swapping, brokering, approving, financing, facilitating, or guaranteeing.

31 C.F.R. § 560.206. The ITR also prohibit "attempts" to violate these restrictions: "Any transaction . . . that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." 31 C.F.R. § 560.203. The ITR provide for a process by which one may obtain a license from OFAC to conduct transactions otherwise prohibited by the ITR. *See* 31 C.F.R. § 560.501.

## III

Mousavi makes two arguments as to why the evidence introduced by the government at trial was insufficient to allow any reasonable jury to convict him of a violation of IEEPA. First, he argues that the government failed to prove any violation of the ITR at all. Second, Mousavi argues that even if his acts constituted a violation of the ITR, the government failed to introduce sufficient evidence that such violation was willful.

## A

Our review of the sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, which

requires a court of appeals to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. *Jackson* "establishes a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution" without "considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Id.* "Second, after viewing the evidence in the light most favorable to the prosecution, [we] must determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson*, 443 U.S. at 319) (brackets omitted). We review the evidence presented at Mousavi's trial under this standard.

## B

We first turn to Mousavi's contention that the evidence presented at trial is constitutionally insufficient to support his conviction because the government failed to prove any violation of the ITR. According to Mousavi, the government proved at most that Mousavi entered into an agreement to provide future services to a Kuwaiti company that sought to do business in Iran. Mousavi argues that because 31 C.F.R. § 560.206, the ITR at issue, does not proscribe an agreement to take steps in the future, the conduct alleged by the government does not fall within the scope of the regulation. Furthermore, Mousavi argues that § 560.206 is not clearly applicable to agreements with companies that are not located in Iran. At a minimum, Mousavi argues, § 560.206 is ambiguous with respect to its applicability to agreements for prospective services with Kuwaiti companies, and the rule of lenity demands that such ambiguity be construed in defendants' favor. Accordingly, Mousavi claims that because there was no evi-

dence that he either engaged in a transaction with Iran or attempted to do so, the government's evidence at trial was insufficient to support his conviction for violation of IEEPA and the ITR.

**[1]** We disagree. The relevant provision of the ITR prohibits "any transaction or dealing in or related to" providing "[g]oods, technology or services" to Iran or its government, whether directly or indirectly. 31 C.F.R. § 560.206. Further, the ITR indicate that any transaction that "attempts to violate" the prohibition against entering into the specified business transactions is prohibited. 31 C.F.R. § 560.203. Contrary to Mousavi's argument, these provisions are not ambiguous; rather, they broadly prohibit any transaction that is related to providing goods or services to Iran, and any attempt to engage in such a transaction. The plain language of this regulation prohibits an agreement to provide future services to Iran: such an agreement would both be a transaction "related to" providing services to Iran, as well as an "attempt to violate" the prohibition against providing such services. *See* 31 C.F.R. § 560.206. Moreover, the regulation bars transactions or dealings to provide goods, technology or services "directly or indirectly" to Iran, which would preclude transactions or dealings with non-Iranian companies for that purpose. 36 C.F.R. § 560.206. Because there is no ambiguity in the regulation, the rule of lenity is inapplicable. *See Rewis v. United States*, 401 U.S. 808, 812 (1971).

**[2]** In light of this clear prohibition, the evidence presented by the government, viewed in the light most favorable to its case, was sufficient to establish a violation of the ITR. *See Nevils*, 598 F.3d at 1164. The jury could reasonably determine that the Agreement between Mousavi and Al Mal, in conjunction with the Incentive Plan and the August 25, 2002 letter, constituted a transaction "related to" the provision of services, "directly or indirectly," to Iran. *See* 31 C.F.R. § 560.206. Moreover, in light of these documents, a juror could reasonably conclude that Mousavi agreed to help Al Mal engage in

several specified transactions with its Iranian partners, including assisting Al Mal's bid for a license "jointly with Iran Electronic Development Company," and establishing a "bank and leasing" company with the Industrial Development and Renovation Organization of Iran. Moreover, a jury could reasonably conclude that the correlation between the wire transfers from Al Mal and the evidence of travel to Iran during the time frame in which the Agreement was finalized indicated that the payments and trips were related to each other, and that Mousavi had actually assisted Al Mal in providing services to Iran.

## C

Mousavi next argues that the government failed to introduce sufficient evidence that Mousavi's violation of the ITR was "willful," as required for the imposition of criminal liability under IEEPA. As noted above, under § 1705(c), the government must prove beyond a reasonable doubt that the defendant acted willfully in committing or attempting to commit a violation of pertinent regulations. *See* 50 U.S.C. §§ 1705(a), (c). Mousavi argues that to prove willfulness in this context, the government must prove that he was aware of the ITR's licensing requirements and knew that entering into the Agreement without a license issued by OFAC was unlawful. According to Mousavi, the government must prove his knowledge of the licensing scheme, not just prove that Mousavi knew he was violating the law, because IEEPA and the ITR establish highly technical requirements, which under the reasoning of *Cheek v. United States*, 498 U.S. 192 (1991), and *Ratzlaf v. United States*, 510 U.S. 135 (1994), require proof of a defendant's knowing violation of a specific provision of law. Because the government failed to provide any evidence that Mousavi knew of the relevant licensing provision, Mousavi argues, the evidence was insufficient to convict him.

### 1

**[3]** Neither this court nor the Supreme Court has previously addressed the definition of "willful" under IEEPA, 50

U.S.C. § 1705(c). As the Supreme Court has noted, the term "willfully" is "a word of many meanings whose construction is often dependent on the context in which it appears." *Bryan v. United States*, 524 U.S. 184, 191 (1998) (internal quotation marks omitted). The Supreme Court's jurisprudence in this area has evolved over time, but now appears to establish two standards, one higher than the other, for "willfulness" in the criminal context. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 58 n.9 (2007); *see, e.g.*, *Cheek*, 498 U.S. at 200-07; *Ratzlaf*, 510 U.S. at 135; *Bryan*, 524 U.S. at 191. In the context of criminal statutes, the word "willful" generally indicates a requirement of specific intent. *United States v. Henderson*, 243 F.3d 1168, 1173 (9th Cir. 2001). "As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.' " *Bryan*, 524 U.S. at 191. Said otherwise, "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.' " *Id.* at 191-92 (quoting *Ratzlaf*, 510 U.S. at 137). But in a context involving "highly technical statutes that present[ ] the danger of ensnaring individuals engaged in apparently innocent conduct," *id.* at 194, the Supreme Court has suggested that "willfulness" requires the government to prove that the defendant acted with "specific intent to violate a known legal duty," *Safeco*, 551 U.S. at 58 n.9.

**[4]** The Supreme Court's cases do not make clear the practical effect, if any, of this heightened standard. *Bryan* and *Safeco* both identify *Cheek* and *Ratzlaff* as examples of cases where the heightened burden of proof applied. *See Bryan*, 524 U.S. at 181; *Safeco*, 551 U.S. at 58 n.9. Neither of these cases, however, required the government to prove the defendant's knowledge of a specific provision of law. In *Cheek*, the Supreme Court held that "willfulness," as used in the criminal provisions of the tax code, required the government to prove that the defendant knew of the legal duty to file an income tax return and to treat his wages as income. 498 U.S. at 202. But the Court noted that the "jury would be free to consider any

admissible evidence from any source" showing that the defendant was aware of this duty. *Id.* While *Cheek* listed "awareness of the relevant provisions of the Code or regulations" as one source of such evidence, it did not identify it as the exclusive source. *Id.* Similarly, *Ratzlaff* held that the government could not carry its burden to prove the "willfulness" requirement in a prosecution for illegal structuring of financial transactions merely by proving that the defendant knew of the bank's duty to report cash transactions of more than $10,000. 510 U.S. at 663 n.19. Nevertheless, the government did not have to prove that the defendant was aware of the provision of the federal statute that made it illegal to structure his cash deposits to avoid triggering the bank's reporting obligation. It was sufficient if a jury could reasonably conclude that the "defendant knew of his duty to refrain from structuring," a conclusion which could be based on "reasonable inferences from the evidence of defendant's conduct." *Id.* Similarly, prior to *Cheek* and *Ratzlaff*, we indicated that "willfulness" under a complex anti-exportation statute required proof of "a voluntary, intentional violation of a known legal duty," *United States v. Lizarraga-Lizarraga*, 541 F.2d 826, 828 (9th Cir. 1976), but we considered this standard satisfied where the government proved "that the defendant [knew] that his conduct . . . is violative of the law." *Id.* at 828-29. These cases make clear that even in the context of "highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct," *Bryan*, 524 U.S. at 194, the term "willfulness" requires the government to prove that the defendant was aware of the legal duty at issue, but not that the defendant was aware of a specific statutory or regulatory provision.

**[5]** Even more to the point, the Supreme Court has not interpreted "willfulness" in criminal statutes to require the government to prove that a defendant was aware of a specific licensing requirement. In *Bryan*, the Supreme Court considered the arguments of a defendant convicted of a conspiracy to violate 18 U.S.C. § 922(a)(1)(A), which criminalizes will-

ful violation of its prohibition on engaging in firearms trading without a license. 524 U.S. at 187 n.2. The evidence produced at trial showed that the defendant "used so-called 'straw purchasers' in Ohio to acquire pistols that he could not have purchased himself; that the straw purchasers made false statements when purchasing the guns; that [the defendant] assured the straw purchasers that he would file the serial numbers off the guns; and that he resold the guns on Brooklyn street corners known for drug dealing." *Id.* at 189. The Court held that this evidence was "unquestionably adequate to prove that [the defendant] was dealing in firearms, and that he knew his conduct was unlawful." *Id.* Furthermore, although the government presented no evidence that the defendant "was aware of the federal law that prohibits dealing in firearms without a federal license," the Supreme Court held that the government had no obligation to prove that the defendant had such knowledge. *Id.* at 189, 194. Rather, the term "willfully" in that context required the government to prove only that the defendant "knew that his conduct was unlawful." *Id.* at 195.

**[6]** In light of these precedents, we conclude there is no basis for requiring the government to prove that a person charged with violating IEEPA and the ITR was aware of a specific licensing requirement. While the prohibitions imposed by IEEPA and the ITR are for conduct that is not "obviously illegal," *see Henderson*, 243 F.3d at 1173, the "danger of ensnaring individuals engaged in apparently innocent conduct," *Bryan*, 524 U.S. at 194, is no greater under IEEPA than under the statute analyzed in *Bryan*; and, there, the Court held that defendants were adequately protected by reserving criminal punishment only for those who know that their actions are illegal, *id.* at 195-96. Similarly, defendants charged with a violation of IEEPA and the ITR are adequately protected by requiring the government to prove that the defendants knew their actions violated the United States' embargo on transactions with Iran. *See id.* Indeed, there is even less reason than in *Bryan* to require the government to prove the defendant knew of the availability of a license, because the

ITR licensing requirement is not, as it was in *Bryan*, an intrinsic part of the criminal offense at issue. The ITR under which Mousavi was convicted does not even explicitly mention a licensing requirement. *See* 31 C.F.R. § 560.206. Rather, it prohibits transactions "[e]xcept as otherwise authorized pursuant to this part." *Id.* These authorizations include licenses as well as other exemptions. *See, e.g.*, 31 C.F.R. § 560.210 ("Exempt transactions"). Accordingly, we conclude that "willfulness" under IEEPA requires the government to prove beyond a reasonable doubt that the defendant acted with knowledge "that his conduct was unlawful," *Bryan*, 524 U.S. at 186, but not that the defendant was aware of a specific licensing requirement.

In so holding, we join those of our sister circuits to have considered and rejected analogous challenges under IEEPA. *See United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 147 & n.2 (2d Cir. 2004) (per curiam) (holding that, to support a conviction for willful violation of IEEPA and the ITR, the government was not required "to prove that [defendant] knew he was not a depository institution entitled to avail itself of an expressed exception to the Embargo" because "the law does not require such a negative finding by the jury to establish willfulness"); *United States v. Dien Duc Huynh*, 246 F.3d 734, 739, 744 (5th Cir. 2001) (holding that sufficient evidence supported conviction for willful violation of the Vietnamese trade embargo, where defendant "knew that there was an embargo in place against Vietnam, and [a witness] testified that [the defendant] told him he was shipping goods to Vietnam by way of Singapore because of the embargo"); *see also United States v. Quinn*, 403 F. Supp. 2d 57, 61 (D.D.C. 2005) (holding that, under *Bryan*, proof of "willfulness" under § 1705(c) of IEEPA does not require knowledge of the licensing requirements under the ITR).

Applying these principles to the circumstances of this case, we hold that in order to sustain a conviction for willful violation of the ITR at issue, 31 C.F.R. § 560.206, the government

had to prove beyond a reasonable doubt that Mousavi knew he was acting unlawfully. But we reject Mousavi's argument that the government also had to prove that Mousavi had a specific understanding of the ITR's licensing requirements.

**2**

Using the correct definition of "willfully," we now must determine whether, taking the evidence in the light most favorable to the government, any rational juror could conclude that Mousavi knew that his conduct was unlawful.

[7] A rational juror could conclude that the evidence showed that Mousavi knew that his agreement with Al Mal, and his subsequent provision of services under that agreement, was unlawful. The evidence showed that Mousavi concealed his income from Al Mal from the government on his tax returns, and the Supreme Court has recognized such evidence of concealment as sufficient to indicate knowledge of unlawfulness. *See Bryan*, 524 U.S. at 189 & n.8 (holding evidence of types of concealment "unquestionably adequate" to prove Bryan's knowledge of unlawfulness).

[8] Furthermore, evidence viewed in the light most favorable to the government indicated that Mousavi had first-hand knowledge of the embargo against Iran. A jury could reasonably conclude that a sophisticated and politically connected businessman like Mousavi who lived and conducted business in Iran after 1979 was aware of the 1979 United States trade embargo. Moreover, Mousavi had scheduled numerous trips for himself and others to Iran, which necessitated obtaining Iranian visas through the Pakistani embassy and coordinating travel through third-party countries because the embargo and trade sanctions prohibited direct flights from the United States to Iran. Mousavi also traveled regularly to Iran. Taking these facts in the light most favorable to the government, they are sufficient to permit a rational juror to conclude beyond a reasonable doubt that Mousavi knew that conducting business

with Iran was illegal and acted willfully by nevertheless conducting such business. *See Jackson*, 434 U.S. at 319.

**IV**

Accordingly, for the reasons stated here and in the concurrently filed memorandum disposition, we affirm Mousavi's conviction under 50 U.S.C. § 1705 and 31 C.F.R. § 560.206. We reverse Mousavi's convictions under 18 U.S.C. §§ 1001 and 1425, and affirm the remaining convictions.

**AFFIRMED IN PART & REVERSED IN PART.**