**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>JENNIFER LYNN FRENCH,<br>*Defendant-Appellant*. | No. 12-10185<br><br>D.C. No.<br>3:08-cr-00006-<br>LRH-WGC-2<br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
March 13, 2013—San Francisco, California

Filed April 7, 2014

Before: John T. Noonan, Raymond C. Fisher,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen;
Dissent by Judge Noonan

**SUMMARY***

**Criminal Law**

The panel affirmed in part and reversed in part a criminal judgment in a case in which the government alleged that the defendant and her then-husband, both of whom proceeded to trial pro se, defrauded customers by tricking them into making advance payments for high-end kitchen appliances which were never delivered.

The panel rejected the defendant's contention that the district court's *Faretta* colloquy was deficient by the omission of an explicit warning about a potential conflict of interest in this multi-defendant prosecution, and held that the defendant's waiver of the right to counsel was voluntary, knowing, and intelligent.

The panel held that the defendant's Sixth Amendment right to self-representation was not violated when she adopted the district court's suggestion to permit her husband to conduct her direct and re-direct examination. The panel held that the district court did not abuse its discretion in denying the defendant's motion for a new trial "in the interests of justice."

The panel held that the evidence was sufficient to support the defendant's convictions for wire and mail fraud, and that the district court properly instructed the jury regarding the mens rea for these offenses. The panel held that the evidence

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

was insufficient to support the defendant's convictions on two money laundering counts, and that the jury was improperly instructed as to one of these charges, where the district court failed to define "proceeds" as "profits." The panel remanded for resentencing in light of the reversal of her convictions on the money laundering counts.

Dissenting, Judge Noonan wrote that the examination at trial of a pro se defendant by an interested, non-lawyer co-defendant is a structural constitutional defect not amenable to harmless error analysis.

## COUNSEL

Michael J. Kennedy (argued), Chief Assistant Federal Public Defender, Rene Valladares, Federal Public Defender, Dan C. Maloney, Research & Writing Attorney, Reno, Nevada, for Defendant-Appellant.

Elizabeth Olson White (argued), Assistant United States Attorney, Daniel G. Bogden, United States Attorney, Robert L. Ellman, Appellate Chief, Reno, Nevada, for Plaintiff-Appellee.

## OPINION

NGUYEN, Circuit Judge:

Jennifer French ("French" or "Jennifer") appeals her convictions and sentence for wire fraud, mail fraud, and money laundering. The charges against French and her then-husband, Darin French ("Darin"), were based on

allegations that the Frenches defrauded customers by tricking them into making advanced payments for high-end kitchen appliances which were never delivered. Prior to trial, both Jennifer and Darin elected to proceed *pro se*. Following a nine-day jury trial, they were both convicted.

On appeal, French raises two Sixth Amendment claims, neither of which merits reversal of her convictions. First, we hold that French's waiver of the right to counsel was voluntary, knowing, and intelligent. Second, we conclude that, during trial, French's right to self-representation was not violated when she adopted the district court's suggestion to permit Darin to conduct her direct and re-direct examination.

French also contends that the evidence was insufficient to support her convictions. We hold that the evidence was sufficient to support her convictions for wire and mail fraud, and the district court properly instructed the jury regarding the mens rea for these offenses. However, the evidence was insufficient to support French's convictions on two money laundering counts, and the jury was improperly instructed as to one of these charges. We therefore affirm in part and reverse in part French's convictions. We need not address French's sentencing claims and remand for re-sentencing in light of the reversal of her convictions on the money laundering counts.

## BACKGROUND

## I. The Scheme to Defraud

The Frenches operated an online eBay-based business, Look What We Got ("LWWG"). According to the indictment, the Frenches used their online business to defraud

customers as follows: LWWG held itself out as being able to order high-end kitchen appliances directly from manufacturers which it could re-sell at a discount. In actuality, however, most major appliance lines had explicitly declined LWWG's request to become an authorized dealer. One such company, Viking, even sent LWWG a cease-and-desist letter demanding that LWWG remove all references to Viking products from its website.

LWWG artificially established a positive feedback record at eBay by creating fake merchandiser accounts to write positive reviews for LWWG. The company also structured transactions in a way that prevented actual customers from leaving feedback on the company's eBay seller profile. Consumers who expressed interest in purchasing appliances from LWWG were directed away from the eBay platform and on to a website for LWWG. They would then receive an email with pricing and purchasing information from "Jennifer" at ebay@lwwg.com. This structure gave consumers the false impression that they were purchasing products through eBay, when in fact the transactions were not conducted on the eBay platform.

Between June 1 and October 8, 2004, LWWG collected $1.6 million in customer payment, but spent only $105,422.07—approximately 10 percent of that amount—on appliances.[1] LWWG accepted payments for appliances by credit card (American Express and Discover), money order, and wire transfer. It then failed to fill hundreds of purchase

---

[1] Given that high-end appliance dealers are in a line of business with expensive inventory, stiff competition from other retailers, and in which major appliance dealers often write price floors into contracts, a 90% gross margin is highly unusual.

orders. Many customers who tried to contact LWWG to check on the whereabouts of their merchandise never received a response. Others were contacted by Jennifer French via phone or email. On numerous occasions, French plied unhappy consumers with excuses for the delay in delivery. Other times, she simply promised them a refund.

LWWG's customers never received any of the promised refunds. Instead, large sums of money were transferred from LWWG's account to the Frenches' joint personal checking account and used to purchase, among other things, a Ford Excursion, a Ford pickup truck, and a $50,880 Bayliner boat. Money from LWWG's account was also transferred to Darin's personal E*Trade account where it was used to purchase stock.

In total, LWWG defrauded its customers out of more than $1.5 million. Eventually, 80 percent of customers were reimbursed by the credit card companies for their loss. However, the 46 customers who paid with personal or cashier's checks lost a combined total of $325,875.00.

## II. Post-Indictment Proceedings

On April 29, 2009, a grand jury returned a superseding indictment, charging Jennifer and Darin French with multiple counts of mail fraud in violation of 18 U.S.C. §1341; wire fraud in violation of 18 U.S.C. § 1343; and money laundering in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 1956(a)(1)(B)(i). In August 2010, after numerous changes of counsel and nine continuances, Jennifer and Darin both moved to proceed *pro se*.

The district court held a hearing on their *Faretta* motions lasting approximately five hours over the course of two days. Although the court conducted the hearing—including sealed portions—in the presence of both Jennifer and Darin, it addressed each defendant separately. Jennifer had done most of the legal research in light of Darin's incarceration for a different appliance-related fraud scheme, and she was the dominant speaker at the *Faretta* hearing.

During this hearing, the district court repeatedly implored the Frenches to maintain their attorney representation. Indeed, the court explicitly stated that it could not "impress on [them] enough how important I think it is that [they] have counsel in this case." The district court then cataloged the many "dangers and disadvantages of representing yourself," warning the Frenches that they would be up against skilled, highly-trained government prosecutors and be disadvantaged in a variety of respects. Upon concluding its discussion, the court suggested that the Frenches might "want a moment to discuss it with your counsel or discuss it with each other." Jennifer interjected, saying:

> I appreciate all your eloquent words, and I do feel that I need a moment because, after listening to you, you have me terrified.

The court then took a recess at Darin's request. Twenty minutes later, Darin assured the court he had elected to represent himself. Jennifer individually assured the court that she had made the same choice.

> THE COURT: Okay. Mrs. French, is that your desire [to represent yourself] as well?

JENNIFER FRENCH: Yes, Your Honor.

After hearing from the government, the court then canvassed each defendant individually. Jennifer stated that her decision to represent herself was a "knowing, intelligent, and voluntary request," made in good faith, and that she understood the penalties relating to each count in the indictment. The court thus concluded that her waiver of counsel was knowing, intelligent and voluntary. It granted Jennifer's request for a continuance, and continued the trial for six months to give the Frenches time to prepare.

On January 13, 2011, during a pretrial conference, the district court raised a potential issue regarding trial presentation in the event either Jennifer or Darin elected to testify, stating:

> With regard to the trial itself, I want to inform the Frenches . . . how we approach this so you can be preparing accordingly . . . .

> [I]t seems to me, that the best way for you to present evidence in the defense case would be for one of you to question the other while the other is testifying. But that's up to you . . . I just alert you that I would accept that approach if that was the way you wanted to approach it.

> So, to be clear here . . . both of you have an absolute privilege not to testify . . . . But in the event that you do choose to testify, the normal rule would be that you have to identify the question you're asking yourself; and then if

the question is not objectionable in one form or another, the Court will clear it and you may proceed with the answer.

That is very awkward in front of a jury because you have to ask yourself the question before you can answer the question, and the government has to have an opportunity to interpose its objection. It's for that reason that I suggest that if one of you is testifying that the other one be questioning the one who is testifying.

But I'm not requiring that. I'm just saying that's an easier way to go. It may make your case go more smoothly.

## III.    Trial and Post-Trial Proceedings

The trial commenced on February 8, 2011. On the fourth day of trial, the district court reiterated its earlier suggestion regarding the method of testimony, stating:

I think the smoothest way for someone – either of you to testify in this case, is if the other one questions that witness because, otherwise, you're in the situation where you're going to be up in the witness box, and you need to indicate what your next question is that you would like to answer.

So you're phrasing your question, you're giving the government an opportunity to object, and then you're – if there's no

> objection, you're going to answer the next question.  And that is awkward. . . .
>
> So I would recommend that if you're going to testify, that Mr. French conduct your examination and you rely upon that.

Jennifer testified on the sixth day of trial, adopting the district court's suggestion to allow Darin to conduct her direct and re-direct examination.  Throughout Jennifer's testimony, Darin used terms such as "we," "us," and "our," making little effort to distinguish between his and Jennifer's conduct.  At least twice, the court sustained objections from the government that Darin was "trying to circumvent testifying by [improperly] trying to get his testimony in through his wife."

The jury began deliberations on the seventh day of trial. The following morning, the court received a note from the jury asking:

> With regards to intent, when it comes to the law, does, "ill" intent have to be established from the start of the company or at any time throughout the life of the company?

The court, with the parties' concurrence, referred the jury to an instruction telling the jury to decide each count against the defendants separately, and instructions regarding the elements of wire fraud and mail fraud, the meaning of "intent to defraud," co-schemers' liability, and good faith defense.  The court also provided a supplemental four-paragraph response, to which Jennifer objected on grounds of redundancy.

After almost three days of deliberations, the jury reached a verdict, convicting Jennifer of 22 counts (14 counts of mail fraud; six counts of wire fraud; and two counts of money laundering) and acquitting her of 30 counts, finding she did not engage in criminal conduct on or before July 12, 2004. Darin was convicted of 36 counts.

At the sentencing, the district court imposed a sentence of 24 months of imprisonment, which represents a substantial downward variance from French's advisory guidelines sentencing range of 46–57 months. French subsequently moved for a new trial under Federal Rule of Criminal Procedure 33, arguing that a new trial was warranted on grounds of instructional error and insufficiency of evidence. In response to the government's opposition brief, she filed a "reply" that raised a number of new assertions. Notably, she argued for the first time that Darin mentally and physically abused her, and that he controlled both her and LWWG's operations. French further claimed that because she believed everything her husband told her—including that LWWG was operated legitimately—she therefore lacked the intent to defraud. The court denied her motion, declining to address issues raised for the first time in her reply brief.

French subsequently moved for reconsideration, reiterating her previous allegations about domestic abuse. The district court denied the motion as untimely and unmeritorious. On April 12, 2012, French timely filed a notice of appeal, challenging her convictions and sentence.

## JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291. *United States v. Juan*, 704 F.3d 1137, 1140 (9th Cir. 2013).

## DISCUSSION

## I. French's Waiver of the Right to Counsel Was Knowing, Intelligent, and Voluntary

French first challenges the validity of her waiver of the right to counsel. The Sixth Amendment guarantees a defendant the right to proceed without counsel. *See Faretta v. California*, 422 U.S. 806, 820 (1975). "Because a defendant who exercises the right to self-representation foregoes the benefits of exercising the right to counsel, the accused must knowingly and intelligently forego those relinquished benefits." *United States v. Gerritsen*, 571 F.3d 1001, 1007 (9th Cir. 2009) (citation omitted). As the Supreme Court explained in *Faretta*:

> Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'

*Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). Although a district court need not recite any set "formula or script" to a

defendant who seeks to waive counsel, *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), we have suggested language to guide district courts in conducting *Faretta* colloquies. *See United States v. Hayes*, 231 F.3d 1132, 1138–39 (9th Cir. 2000).[2] In general, district courts must ensure that a defendant understands: (1) the nature of the charges against her; (2) the possible penalties; and (3) the dangers and disadvantages of self-representation. *See United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004).

"Whether a defendant knowingly and intelligently waived his right to counsel is a mixed question of law and fact, reviewed de novo." *United States v. Hantzis*, 625 F.3d 575, 579 (9th Cir. 2010). In assessing the validity of a defendant's

---

[2] Specifically, in *Hayes*, we suggested the following language:

> The court will now tell you about some of the dangers and disadvantages of representing yourself. You will have to abide by the same rules in court as lawyers do. Even if you make mistakes, you will be given no special privileges or benefits, and the judge will not help you. The government is represented by a trained, skilled prosecutor who is experienced in criminal law and court procedures. Unlike the prosecutor you will face in this case, you will be exposed to the dangers and disadvantages of not knowing the complexities of jury selection, what constitutes a permissible opening statement to the jury, what is admissible evidence, what is appropriate direct and cross examination of witnesses, what motions you must make and when to make them during the trial to permit you to make post-trial motions and protect your rights on appeal, and what constitutes appropriate closing argument to the jury.

231 F.3d at 1138–39.

waiver, a reviewing court may look to the record as a whole, not just what was said at the *Faretta* colloquy. *Gerritsen*, 571 F.3d at 1008. The focus is properly on "what [a defendant] understood, not what the court said or understood." *Id*. at 1010. Failure to meet the requirements for a valid waiver constitutes *per se* prejudicial error, requiring reversal of a defendant's conviction. *See Erskine*, 355 F.3d at 1167.

## A.

According to French, the court's *Faretta* colloquy was deficient because she was left "unaware of the dangers and disadvantages of self-representation in multi-defendant prosecutions where conflicts of interests exist."[3] By faulting the court for failing to warn her about the existence of a potential conflict, French effectively asserts that the district court was obligated to advise her as to a potential substantive defense—that she lacked knowledge about the fraudulent nature of Darin's scheme. A warning of this nature, however, differs materially from the sorts of *pro se* "pitfalls" to which the phrase "dangers and disadvantages of self-representation" has been generally understood to refer.

As we have explained, the phrase "dangers and disadvantages" does *not* mean that "the judge must serve as a surrogate lawyer for the defendant." *Hayes*, 231 F.3d at 1138. Rather, the purpose of advising a defendant about the

---

[3] We first address French's claims regarding self-representation and the court's *Faretta* colloquy, separate from the issue of how Darin asking questions during French's testimony changed the dynamic of French's representation. Later, we address Darin's questioning, which created the opportunity for conflict after the colloquy.

dangers and disadvantages of self-representation is to ensure that he or she understands the value of being represented by counsel. *See United States v. Gillings*, 568 F.2d 1307, 1309 (9th Cir. 1978) ("The defendant must be aware that he or she will be on his or her own in a complex area where experience and professional training are greatly to be desired."); *United States v. Mohawk*, 20 F.3d 1480, 1484 (9th Cir. 1994) (an accused seeking self-representation must understand "the possible consequences of mishandling [a lawyer's] core functions and the lawyer's superior ability to handle them").

French relies on the Supreme Court's reference to "case-specific factors" in *Tovar*, 541 U.S. at 88, to support her contention that the court was required to provide a conflict advisement as part of its *Faretta* colloquy. This argument, however, is inconsonant with *Tovar*'s actual holding. The question in *Tovar* was whether the Sixth Amendment requires a trial court to specifically warn defendants that "waiving the assistance of counsel in deciding whether to plead guilty [entails] the risk that a viable defense will be overlooked." *Tovar*, 541 U.S. at 81. Writing for a unanimous court, Justice Ginsburg opined that the Sixth Amendment did not compel such an admonition. *Id*. at 92.

French asserts that the case-specific factors which must be considered under *Tovar* "surely include" the involvement of multiple defendants with possible conflicts of interest. Nothing in our case law requires such explicit advisement in the context of non-joint representation.[4] *See Tovar*, 541 U.S. at 92 (a *Faretta* waiver can "satisf[y] the constitutional minimum" even where a defendant "lack[s] a full and

---

[4] Again, we address the impact that Darin's questioning had on French's representation later.

complete appreciation of *all of the consequences* flowing from his waiver" (emphasis added)); *see also Gerritsen*, 571 F.3d at 1012 (interpreting *Tovar*'s reference to "case-specific factors" as pertaining to factors bearing on the defendant's knowledge about the value of counsel).

Nor do we agree with French that *Gillings*, 568 F.2d 1307, is instructive. In *Gillings*, we held that although Francis Gillings knowingly and intelligently waived his right to counsel in a prosecution for tax-related crimes, his wife and co-defendant, Ruth Gillings, did not. *Id*. at 1309. We reasoned that Ruth's participation in the colloquy consisted of merely pro forma answers to pro forma questions at the very end of the hearing. *Id.* Here, in contrast, French participated significantly in the extensive colloquy conducted by the district court. Moreover, because no conflict of interest issue was implicated in *Gillings*, the case provides scant support for French's position.**[5]**

---

**[5]** French also cites Federal Rule of Criminal Procedure 44(c) as support for her argument. This provision states, in relevant part:

> The court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel.

Fed. R. Crim. P. 44(c)(2). French's reliance on Rule 44(c) is misplaced because she never moved for joint representation; she moved to represent herself and Darin moved to represent himself. Since each sought only to represent *himself* or *herself,* it makes little sense to mandate a Rule 44(c) advisement.

We thus reject French's claim that the *Faretta* colloquy was rendered constitutionally deficient by the omission of an explicit warning about a potential conflict of interest, particularly because Darin had no involvement in French's individual self-representation at this stage of the proceedings.

B.

We next address whether French's waiver of the right to counsel was knowing, intelligent, and voluntary. The district court conducted an extensive and thorough colloquy, guided by our model language. It adequately apprised French of the dangers and disadvantages of self-representation with respect to, *inter alia*, jury selection, opening statements, closing arguments, evidentiary objections, framing questions to witnesses, introducing evidence, examining witnesses, making motions and preserving a record, procedural rules, and oral advocacy. While French makes much of her statement that she was "terrified" by the court's warnings, her trepidation actually belies her claim that her waiver was not knowing and intelligent. That she was "terrified" of proceeding *pro se* suggests that she was, in fact, fully able to grasp the hazards of self-representation.

As to the voluntariness of her waiver, French contends that because her decision to proceed *pro se* was a "by-product" of her husband's physical and emotional abuse, it was not truly voluntary. Again, the record tells a different story. Not only did French expressly affirm that her request to proceed *pro se* was voluntary, she was the dominant advocate at the hearing on the motion. In response to the court's questions about the basis for their *Faretta* request, French listed numerous motions, evidentiary requests, and discovery requests which she thought counsel should have

filed with the court; she discussed defects she perceived in the indictment; she named material witnesses who had not yet been interviewed; and she discussed her distrust of counsel. Given the objective indicia of voluntariness—to wit, her active and personal participation in support of her motion to proceed *pro se*—the district court properly found that her waiver was voluntary. *See Gerritsen*, 571 F.3d at 1008.

Based on the foregoing, we therefore hold that French waived her right to counsel knowingly, intelligently, and voluntarily.

## II. During Trial, French's Right to Self-Representation Was Not Violated

We turn next to a related question—whether the trial court denied French's right of self-representation when it allowed Darin to conduct her direct and re-direct examination at trial. This inquiry presents a mixed question of law and fact and thus is subject to de novo review. *McKaskle v. Wiggins*, 465 U.S. 168, 177 (1984); *Erskine*, 355 F.3d at 1166. Because denial of the right to self-representation is structural, it is therefore not amenable to harmless error analysis. *McKaskle*, 465 U.S. at 177 n.8; *see also Frantz v. Hazey*, 533 F.3d 724, 728 (9th Cir. 2008) (en banc).

Specifically, French contends that allowing Darin to direct her testimony on the stand infringed upon her "core" *Faretta* right under *McKaskle* to "preserve actual control over the case" presented to the jury. *McKaskle*, 465 U.S. at 178. This argument carries some intuitive appeal. Allowing one *pro se* defendant to conduct another *pro se* defendant's examination at trial raises concerns about the erosion of the testifying defendant's *Faretta* rights, as well as an obvious

problem with potential conflicts of interest. We are unaware of any other instance in which a trial court allowed such an arrangement. But the constitutional question before us cannot be resolved in the abstract; our decision must turn on the *facts* of this particular case. As the Supreme Court has explained, in determining whether a *pro se* defendant's right to self-representation was respected, the crucial question is whether she had a "fair chance to present [her] case in [her] own way." *McKaskle*, 465 U.S. at 176. Here, our review of the record leads us to conclude that French not only had such a chance, but she in fact presented her case in her own way.

Although French may have ceded control of her examination to her husband, she ultimately retained control over the case presented to the jury. From the outset, she gave the district court every indication that she and her husband would present a coordinated defense, predicated on the theory that they ran a legitimate, "innovative" business that was simply unsuccessful.[6] As previously noted, Jennifer took the lead in preparing pre-trial motions (on behalf of both herself and Darin), and actively participated in pre-trial hearings. She also expressed concern about how seating arrangements in the courtroom could impair her ability to confer with Darin throughout the trial. In short, she was thoroughly engaged, and numerous times took the lead, at every stage of the proceedings.

---

[6] The "innovative" business plan was for LWWG to purchase full-priced appliances from suppliers, and then take advantage of their status as a Nevada corporation to sell to California consumers at a discount, without collecting sales taxes. The Frenches purported to believe that they could generate good will from doing this, which would somehow eventually translate to profit.

Further, the evidence suggests that the testimonial arrangement which French now claims violated her Sixth Amendment rights was, at the time, a deliberate tactical decision. On at least two occasions, she inquired about the admissibility of Darin's prior felony conviction for a different scheme. In response, the court explained that such evidence could come in if Darin were to testify. French's manifest concern about keeping Darin's prior fraud conviction out of evidence strongly supports an inference that, to the extent Darin used her as a mouthpiece at trial, it was in furtherance of a strategy to which she acceded.

Moreover, even assuming that Darin controlled her examination (and that she played no part in crafting the questions asked of her on the stand), Jennifer spoke on her own behalf numerous times during trial. After Darin gave an opening statement, she gave her own separate opening statement in which she not only reiterated the same defense theory advanced in Darin's opening, but referred to herself and Darin as "the defendants," rather than as individual actors. Similarly, at the end of trial she followed Darin's closing statement with her own short summation, in which she again emphasized that she and Darin were failed business owners, but not criminals. French also actively participated in the cross-examination of government witnesses, separately questioning 10 different witnesses.[7] At one point, she even corrected the trial court's misimpression that "[her] husband

---

[7] French's questions were generally consistent with Darin's defense strategy with one exception: she asked one witness a question designed to point out that the E*Trade account into which company funds were transferred was held exclusively in Darin's name. This question indicates that she was willing and able to differentiate her conduct from Darin's when she so desired.

was questioning for [her]." Thus, viewing the record in totality, we find that French was afforded a fair chance to present her own case.[8]

Nor are we persuaded by French's contention that *McKaskle* compels reversal of her convictions. In *McKaskle*, the Supreme Court imposed certain limitations to protect a *pro se* defendant's *Faretta* right against unsolicited and excessively intrusive participation by standby counsel. *McKaskle*, 465 U.S. at 178–79. This case differs from *McKaskle* in at least one crucial respect: unlike Jennifer, who acquiesced in Darin's involvement in her examination, the defendant in *McKaskle* expressly objected to standby counsel's participation. This distinction is important because, as the Court explained in *McKaskle*,

> [a] defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense. . . . Even when he insists that he is not waiving his *Faretta* rights, a pro se defendant's solicitation of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably. . . . [I]f a defendant is given the opportunity and elects to have counsel appear before the court or jury, his complaints concerning counsel's subsequent

---

[8] Additionally, in suggesting that Darin conduct Jennifer's examination, the district court expressly noted that she could ask herself follow-up questions to any question Darin asked. She did not take advantage of this opportunity, however.

> unsolicited participation lose much of their
> force.

*Id.* at 182–83.  So too here, the fact that French readily
assented to her husband's role in shaping her examination
"substantially undermines" her post-hoc claim that he
interfered with her ability to control her own case in violation
of her Sixth Amendment rights.  *Id.*[9]

Importantly, however, the district court's suggestion that
Darin conduct Jennifer's direct and re-direct examination
likely contravened the well-settled rule against lay
representation and created the opportunity for conflict.
28 U.S.C. § 1654; *see also Wheat v. United States*, 486 U.S.
153, 159 (1988) ("an advocate who is not a member of the
bar may not represent clients (other than himself) in court");
*Johns v. County of San Diego*, 114 F.3d 874, 876 (9th Cir.
1997) ("While a non-attorney may appear pro se on his own
behalf, he has no authority to appear as an attorney for others
than himself." (internal quotation marks omitted)); *accord
United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89
(2d Cir. 2008); *Lewis v. Lenc-Smith Mfg. Co*., 784 F.2d 829,
830 (7th Cir. 1986) ("[I]t is clear that an individual may
appear in the federal courts only *pro se* or through counsel.");

---

[9] We note that the district court could have appointed standby counsel
to assist French, even over her objection.  *See Faretta*, 422 U.S. at 834
n.46.  But, ignoring the practical problems that appointing standby counsel
would have presented, such as a serious delay in the jury trial, there is no
indication in the record that French would have been inclined to testify in
any other way.  *See Cooks v. Newland*, 395 F.3d 1077, 1080 (9th Cir.
2005) ("Standby counsel may . . . participate in trial proceedings, without
the express consent of the defendant, so long as the participation does not
'seriously undermine[]' the 'appearance before the jury' that the defendant
is proceeding pro se." (citing *McKaskle*, 465 U.S. at 187)).

*Herrera-Venegas v. Sanchez-Rivera*, 681 F.2d 41, 42 (1st Cir. 1982) ("The federal courts have consistently rejected attempts at third-party lay representation. By law an individual may appear in federal courts only pro se or through legal counsel." (citation omitted)).

But, even assuming the district court erred in this regard, the record does not support the conclusion that, had Jennifer conducted her own examination, she would have pursued an independent defense which placed the blame solely on Darin. Accordingly, any such error was harmless. *See United States v. Spangle*, 626 F.3d 488, 494 (9th Cir. 2010) ("Any alleged violation of a party's statutory right to self-representation is reviewed under a harmless error standard." (discussing 28 U.S.C. § 1654)).

In finding a constitutional violation, the dissent confuses the Sixth Amendment *right to counsel* with the Sixth Amendment *right to self-representation*. The dissent acknowledges that—in accordance with *Faretta*—French waived her Sixth Amendment right to counsel and elected to proceed *pro se*. The dissent also rightly points out that the Sixth Amendment "affords the right of self-representation," but not a *right* to "lay representation." *See United States v. Wright*, 568 F.2d 142, 143 (9th Cir. 1978) (citing cases). But the dissent then arrives at the converse conclusion—that lay representation in this case *violates* the Sixth Amendment and constitutes structural error.

French nowhere argues that her Sixth Amendment right to counsel was violated. Instead, as she correctly recognized, the question is whether her right to represent herself was compromised. The dissent, on the other hand, in concluding that French's Sixth Amendment right was violated, relies

solely on cases involving purported violations of the Sixth Amendment right to counsel. Given French's valid *Faretta* waiver, the Sixth Amendment right to counsel and the authorities cited by the dissent are inapposite.

In sum, while we harbor substantial misgivings about the examination technique employed in this case, given the considerable evidence showing that French personally acceded to—indeed, deliberately pursued—the same defense theory that Darin sought to establish through her testimony, we hold that her right to self-representation was not violated.

## III. The District Court Properly Denied French's Motion for a New Trial

French also asserts that she was entitled to a new trial in the "interests of justice" because her husband's abuse and manipulation precluded her from pursuing her independent defense. Fed. R. Crim. P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."). We review the district court's denial of a motion for a new trial for abuse of discretion. *See United States v. Moses*, 496 F.3d 984, 987 (9th Cir. 2007). In determining whether a district court abused its discretion, we apply a two-part test. First, we determine de novo whether the court identified the correct legal rule to apply to the relief requested. *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc). If so, we then consider "whether the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.*

French fails to satisfy this standard. The district court stated the correct legal standard in denying both her initial motion for a new trial and motion to reconsider denial of her new trial motion. Nor was its application of this standard illogical, implausible, or without support in the record. Because French did not raise her arguments about Darin's alleged abuse until more than 14 days after the jury verdict, the district court did not abuse its discretion in deeming her motion untimely under Fed. R. Crim. P. 33(b)(2).

French relies on *United States v. Mack*, 362 F.3d 597 (9th Cir. 2004), and *Rodgers v. Marshall*, 678 F.3d 1149 (9th Cir. 2012), neither of which compels a contrary conclusion. In *Mack*, we held that it was structural error to forbid a *pro se* defendant from cross-examining witnesses, making objections, or presenting a closing argument, even where the defendant was disruptive and contemptuous of the court. 362 F.3d at 601–03. And, while we held in *Rodgers* that a *pro se* defendant's Sixth Amendment rights were violated where the district court denied his request to appoint counsel to assist him with a post-verdict motion, 678 F.3d at 1154, the Supreme Court later reversed this decision. *Marshall v. Rodgers*, 133 S. Ct. 1446 (2013) (per curiam). The Supreme Court held that no such right was clearly established under its precedent. *Id.* at 1450–51. Thus, neither *Mack* nor *Rodgers* supports the proposition that the district court abused its discretion by refusing to grant French's post-conviction motions "in the interest of justice."

**IV.     Sufficient Evidence Supported French's Wire and Mail Fraud Convictions, but Not the Money Laundering Convictions**

Next, French contends that the district court should have granted her motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c) because the evidence was insufficient to support her convictions. We review a district court's denial of a Rule 29 motion de novo. *United States v. Wiggan*, 700 F.3d 1204, 1210 (9th Cir. 2012). When assessing a sufficiency of evidence challenge, we must consider the evidence presented at trial in the light most favorable to the prosecution. *United States v. Nevil*s, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). We then ask "whether this evidence, so viewed, is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.* (alteration, citation, and internal quotation marks omitted).

A.

We first consider whether sufficient evidence supported French's wire and mail fraud convictions. The elements of these offenses are (1) proof of a scheme to defraud, (2) using the mails or wires to further the fraudulent scheme, and (3) specific intent to defraud. 18 U.S.C. §§ 1341, 1343; *see also United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) (noting that the elements of mail and wire fraud are the same). "It is settled law that intent to defraud may be established by circumstantial evidence." *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003).

French contends that there was insufficient evidence that she acted with the requisite intent. We disagree. At trial, the

government presented considerable circumstantial evidence of French's intent to defraud. For example, the dealer who functioned as LWWG's appliance supplier testified that French falsely told him she was a designer buying appliances for her clients. Further, even though this dealer stopped selling to the Frenches in May 2004 (effectively leaving their business without a supplier), French continued to cash checks and placate customers with falsehoods well into that summer. For instance, French falsely stated in an email to a customer that LWWG would send his refund as soon as the company got the funds back from the "second supplier" (who did not, in fact, exist). Numerous other witnesses similarly testified that they either spoke to or exchanged emails with French about their orders. Additionally, the evidence showed that during the summer of 2004, LWWG increased its revenue from sales of appliances, yet decreased its inventory considerably.

Viewing the evidence in the light most favorable to the prosecution, as we must, we believe a rational trier of fact could have found beyond a reasonable doubt that French possessed the requisite intent to defraud. Accordingly, French's sufficiency of evidence challenge fails with respect to her convictions for mail and wire fraud.

B.

French also challenges the sufficiency of evidence supporting her convictions of two counts of money laundering. We turn first to her conviction of money laundering in violation of 18 U.S.C. § 1957, as charged in Count 61 of the indictment. Criminal liability attaches under § 1957 where a defendant (1) knowingly engages in a monetary transaction, (2) knowing that the transaction

involved criminal property, (3) the property's value exceeds $10,000, and (4) the property derives from a specified unlawful activity.[10] *Rogers*, 321 F.3d at 1229.

Here, the charge in Count 61 was based on a transfer of $30,000 from LWWG's bank account to the Frenches' joint personal bank account on July 27, 2004. These funds were then used to purchase a 2003 Ford F250 pickup truck. French argues that this conviction should be reversed because there was no evidence that she, as opposed to her husband, engaged in a monetary transaction relating to the purchase of this truck. We agree. The government fails to cite any evidence—and we are aware of none—supporting this particular count of the indictment as to Jennifer French. To the contrary, the only evidence pertaining to Count 61 is testimony from a manager at Ford that Darin was the individual who bought the truck, and that he alone signed the transaction documents. Because the government has not pointed to any evidence from which a rational trier of fact could infer that French knowingly engaged in a monetary transaction involving criminal property in purchasing the pickup truck, her conviction for money laundering pursuant to § 1957 cannot stand.[11]

---

[10] Mail fraud is listed as a "specified unlawful activity." 18 U.S.C. § 1957(f)(3); 18 U.S.C. §1956(c)(7)(A); 18 U.S.C. §1961(1).

[11] We also find instructional error with regard to Count 61 because the court failed to define "proceeds" as "profits" under *United States v. Santos*, 553 U.S. 507 (2008), and *United States v. Bush*, 626 F.3d 527 (9th Cir. 2010). Addressing this same issue in Darin French's appeal, we reversed his money laundering convictions based on the purchases of the pickup truck and boat. *See United States v. Darin French*, No. 11-10294, 494 F. App'x 784 (9th Cir. 2012). The same reasoning applies here—whether the Frenches' use of the truck to deliver appliances was a

We also agree with French that the government failed to adduce sufficient evidence to support her conviction for money laundering in violation of 18 U.S.C. § 1956(a)(1)(B), as charged in Count 62.  This charge was based on a $40,000 transfer of funds from LWWG's  bank account to Darin's E*Trade account between August 5 and 19, 2004.  To convict a defendant of money laundering under § 1956(a)(1)(B), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction, (2) the transaction involved the proceeds of unlawful activity, (3) the defendant knew that the proceeds were from unlawful activity, and (4) the defendant knew that the transaction [was] designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.  *United States v. Wilkes*, 662 F.3d 524, 545 (9th Cir. 2011).

The government maintains that this conviction was adequately supported by two pieces of evidence: (1) Jennifer's statement that she and Darin sold E*Trade stocks to "put [the money] back into the business . . . to keep our business running"; and (2) the fact that $50,000 was transferred from Darin's E*Trade account to the Frenches' joint checking account between September 2 and September 9, 2004.  This evidence, however, is not enough to sustain French's conviction under § 1956(a)(1)(B), even when viewed in the light most favorable to the prosecution.

Unlike the transactions which formed the basis of other money laundering charges in the indictment, the funds at

"central component of the scheme" under *United States v. Van Alstyne*, 584 F.3d 803 (9th Cir. 2009), is a factual question that should have gone to the jury. *See French*, 2012 WL 4845561, at *2.

issue in Count 62 were not transferred from LWWG's account to the Frenches' joint Bank of the West account; they went directly to an E*Trade account held exclusively in Darin's name. Notably, there is no evidence in the record indicating that Jennifer had access to this account, let alone that she personally transferred money into it, knowing the funds to be the proceeds of unlawful activity. Contrary to the government's contention, that French was aware that her husband had an E*Trade account when she testified at trial in February 2011 does not mean that she was aware of—let alone had access to—the account at the time of the offense conduct in 2004. Moreover, the statement on which the government relies as corroborating evidence does not appear to refer to the same monetary transaction upon which Count 62 is based. To wit, when French said that "the E*Trade stocks [were] *sold*, put *back into* the business" (emphasis added), she could only have been talking about funds which were transferred *out of* Darin's E*Trade account and into their joint checking account—not the transaction charged in Count 62, which was the $40,000 transfer of funds from LWWG's account *into* Darin's E*Trade account. Accordingly, we conclude that a rational trier of fact could not have found the essential elements of the money laundering offense charged in Count 62 beyond a reasonable doubt. *See Nevils*, 598 F.3d at 1161.

We therefore reverse French's two convictions for money laundering in violation of 18 U.S.C. § 1957 and 18 U.S.C. § 1956(a)(1)(B).

## V.  The Supplemental Jury Instruction Was Not Plainly Erroneous

French also contends that the district court erred in formulating a supplemental jury instruction regarding the meaning of "ill intent."  Because French objected to the supplemental instruction on a different basis at trial than she now raises on appeal, plain error review applies.  *See United States v. Del Toro-Barboza*, 673 F.3d 1136, 1152 (9th Cir. 2012).

On the second day of deliberations, the jury submitted a note:

> With regards to intent, when it comes to the law, does "ill" intent have to be established from the start of the company or at any time throughout the life of the company?

Following discussion with the parties, the court referred the jury to an instruction telling them to consider each count separately, as well as to instructions regarding aiding and abetting, elements of mail fraud, elements of wire fraud, the definition of "intent to defraud," co-schemer liability, and good faith.  After continued discussions, the court issued a supplemental instruction that included the following language:

> Your question concerns intent and the timing of intent.  As reflected in the instructions, a necessary element of mail fraud and wire fraud is an intent to defraud; that is, an intent to deceive or  cheat at the time of the offense alleged against each  defendant.

> The intent to defraud must have existed at the time of the alleged offense. However, the jury is entitled to consider all of the evidence bearing upon intent as it may relate to intent at the time of the charged offense.

French argues that by focusing exclusively on the intent-to-defraud element of mail and wire fraud, the trial court's supplemental instruction "diluted" another aspect of criminal intent—the element of "knowingly participating in a scheme." We recognize the ambiguity inherent in the jury's question; it was unclear whether their query about "ill intent" pertained only to the intent-to-defraud element, or to the broader mens rea. However, the crucial inquiry at this juncture is "how the jury would have reasonably understood the challenged instruction in the context of the instructions *as a whole*." *United States v. Moran*, 493 F.3d 1002, 1009–10 (9th Cir. 2007) (per curiam) (emphasis added); *see also United States v. Hofus*, 598 F.3d 1171, 1174 (9th Cir. 2010) (stating that the relevant inquiry for a reviewing court is "whether the instructions *as a whole* are misleading or inadequate to guide the jury's deliberation" (emphasis added)). So viewed, the district court's supplemental instruction was not plainly erroneous. The jury instructions as a whole clearly and repeatedly articulated the "knowing participation" element of the offense. Moreover, any minor ambiguity regarding the meaning of "ill intent" was not likely prejudicial in light of the clear instruction that the "good faith of a defendant is a complete defense" because it is "inconsistent with the intent to defraud required in all mail fraud and wire fraud offenses." *Cf. Moran*, 493 F.3d at 1010 (upholding instructions that had a "minor ambiguity" after a "careful picking apart" of the wording). Accordingly, we reject French's challenge to the supplemental jury instruction.

CONCLUSION

Based on the foregoing, we affirm French's convictions of mail and wire fraud, reverse her convictions for money laundering, and remand for re-sentencing.**[12]**

**AFFIRMED in part; REVERSED in part.**

---

NOONAN, Circuit Judge, dissenting;

Today, the majority approves as harmless the examination at trial of a pro se defendant by an interested, non-lawyer co-defendant. Because this result is unconstitutional and because representation by a lay person bears directly on the "framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), the defect is structural and not amenable to harmless error. *See McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).

We begin with the text of the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This provision guarantees a criminal defendant the appointment of counsel for his defense at all critical stages of the prosecution. *Gideon v. Wainwright*, 372 U.S. 335, 343–44 (1963). The Supreme Court has recognized one solitary constitutionally permissible alternative to

---

**[12]** Because the matter is remanded for sentencing, we need not address French's sentencing claims raised on appeal. We note, however, that her claim of procedural error is foreclosed by our decision in *United States v. Vasquez-Cruz*, 692 F.3d 1001 (9th Cir. 2012).

representation by counsel that is "necessarily implied by the structure of the [Sixth] Amendment": a defendant's constitutional right to represent himself. *Faretta v. California*, 422 U.S. 806, 819 (1975). These rights balance trial fairness, *see Gideon*, 372 U.S. at 344, with "the dignity and autonomy of the accused," *McKaskle*, 465 U.S. at 176–77. We have described these rights as "reciprocal," *John-Charles v. California*, 646 F.3d 1243, 1248 (9th Cir. 2011), suggesting that these rights are the two and only two options allowable under the Sixth Amendment. We have also described these rights as "concomitant," *Sandoval v. Calderon*, 241 F.3d 765, 774 (9th Cir. 2000), "correlative and mutually exclusive," *United States v. Gerritsen*, 571 F.3d 1001, 1007 (9th Cir. 2009); *see also Faretta*, 422 U.S. at 825 ("The right to counsel was viewed as guaranteeing a choice between representation by counsel and the traditional practice of self-representation.").

We are unaware of any court that has allowed the arrangement here, *see* Op. at 19, and for good reason. "Nothing in the language or the history of the sixth amendment to the Constitution" contemplates permitting representation by persons who are not qualified attorneys. *United States v. Wright*, 568 F.2d 142, 143 (9th Cir. 1978). Indeed, lay representation would obstruct the objectives of the Sixth Amendment, "not further them." *Id.* "Whatever else it may mean," the Supreme Court has explained, "the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a **lawyer** at or after the time that judicial proceedings have been initiated against him." *Brewer v. Williams*, 430 U.S. 387, 398 (1977) (emphasis added); *see also United States v. Turnbull*, 888 F.2d 636, 638 (9th Cir.

1989) (holding that "counsel" means "attorney" under the Sixth Amendment).

The law is clear: "Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients (other than himself) in court." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Once Jennifer decided to proceed pro se and her request was honored by the court, she may not be represented by an individual, other than herself, who is not a licensed attorney. Indeed, the "control" test in *McKaskle*, upon which the majority heavily relies, was contemplated only in relation to standby counsel. *McKaskle*, 465 U.S. at 176. While a court may appoint qualified standby attorney as a safeguard for a pro se defendant, *see, e.g.*, *id.*, a trial judge may not allow, let alone encourage, a non-lawyer to represent a defendant at a critical stage of her trial.

We have already held that representation by a person who is not a qualified attorney constitutes a per se violation of the Sixth Amendment where "the defendant's representative had never been admitted to any bar." *United States v. Hoffman*, 733 F.2d 596, 600 (9th Cir. 1984). "The principle applied in such cases is that one never admitted to practice law and therefore who never acquired the threshold qualification to represent a client in court cannot be allowed to do so . . . for purposes of the Sixth Amendment." *United States v. Mouzin*, 785 F.2d 682, 697 (9th Cir. 1986). Other circuits agree. *See, e.g.*, *Solina v. United States*, 709 F.2d 160, 168 (2d Cir. 1983); *Harrison v. United States*, 387 F.2d 203, 212–14 (D.C. Cir. 1967).

Rules governing representation by counsel are fruits of long English and American experience. *See Faretta*, 422 U.S. 821–33. These rules are not to be lightly

disregarded in the interest of efficiency or in order to move things along. Well-intentioned as the trial judge was, he had no authority to suggest that a non-lawyer – much less an interested co-defendant – represent a criminal defendant, nor did that defendant have any right to be represented by one, other than herself, who is not a member of the bar. Without the assistance of counsel and after losing her right to represent herself at a critical stage at her trial, Jennifer was convicted of a serious federal crime. Her conviction cannot stand.